RHEA *et al.* *v.* NEWPORT N. & M. V. R. Co.

*(Circuit Court, D. Kentucky.   April 7, 1892.)*

1. NAVIGABLE WATERS—OBSTRUCTION—ERECTION OF BRIDGES—LIABILITIES.
   A railroad company, empowered by its charter to erect and maintain a bridge across the Cumberland river, in Kentucky, "so as not unreasonably to obstruct navigation," while rebuilding a portion of the bridge which had been blown down, erected a temporary bridge, which interfered with navigation, but arranged with all the packet companies plying the river for the transfer of all freight without extra charge to shippers.   The amount of traffic of the railroad largely exceeded that on the river, and public convenience was in fact subserved by the plan pursued by the railroad company.   *Held*, that this was not an unreasonable obstruction of navigation, and a shipper who refused to send his grain by water under the arrangement was not entitled to recover the extra freight paid for transporting it by rail.

2. INTERSTATE COMMERCE—STATE REGULATIONS.

The commercial power of congress is exclusive of state authority only where the subjects upon which it is exerted are national in their character, and admit and require uniformity of regulations affecting alike all the states; and when the subjects within that power are local in their nature or operation, or constitute mere aids to commerce, the states may provide for their regulation and management until congress intervenes and supersedes their action. *Cardwell* v. *Bridge Co.*, 5 Sup. Ct. Rep. 423, 113 U. S. 205, followed.

3. SAME—BRIDGES.

The erection of a bridge entirely within a state across a navigable river running partly within and partly without the state is not a matter so intimately connected with interstate commerce as to be under the exclusive control of congress; and, in the absence of congressional action, the state has authority to regulate the same. *Railway Co.* v. *Backus*, 46 Fed. Rep. 216, distinguished.

In Equity. Bill by B. S. Rhea & Son against the Newport News & Mississippi Valley Railroad Company to restrain the obstruction of navigation in the Cumberland river, and to recover damages alleged to have been sustained on account of the obstruction. Bill dismissed.

*Frazier & Dickinson* and *Dodd & Dodd,* for complainants.

*Holmes Cummins, Bullitt & Shield,* and *Humphrey & Davie,* for defendants.

JACKSON, Circuit Judge. This cause is now before the court upon exceptions on the part of both complainants and defendants to the report of the special master, filed herein February 15, 1892, and for final hearing upon the merits. The conclusions reached by the court upon the whole case render it unnecessary to notice and consider the master's report and the exceptions thereto in detail. The bill was filed April 9, 1890, to restrain the defendant from obstructing the navigation of the Cumberland river, and to recover the special damage sustained by complainants because of such obstruction. The defendant is a Connecticut corporation, engaged in operating a line of railway from the city of Louisville, Ky., to and through the city of Paducah, Ky., to the city of Memphis, Tenn. This line of railroad, originally chartered by the state of Kentucky under the name of the Chesapeake, Ohio & Southwestern Railroad Company, and to whose rights and franchises the defendant has succeeded, crosses the Cumberland river at a point near Kuttawa, in Lyon county, Ky., on a bridge consisting of a draw-span and adjacent fixed spans. The original railroad company, to whose rights and franchises the defendant has succeeded, was fully authorized by the legislature of Kentucky to erect and maintain a bridge at said point, "so as not unreasonably to obstruct the navigation of any navigable stream." The bridge, the river, and both banks thereof, at the place of crossing, are situated wholly within the limits or territory of the state of Kentucky. The bridge over the river, as constructed and maintained prior to March 27, 1890, constituted no unlawful obstruction or interference with the free navigation of the Cumberland river, which rises in Kentucky, flows southward into and through Tennessee, and then back again into Kentucky; and, after crossing the latter state, empties into the Ohio river. On March 27, 1890, the draw-span and one adjacent fixed span of said bridge were blown down by a tornado of great violence.

The defendant took prompt steps to rebuild its bridge, and in doing·so erected, or caused to be erected, temporary false work on piles across the river, under the draw-span, upon which its line was continued, while the bridge was being rebuilt or repaired. The piles and false work obstructed and interrupted the ordinary navigation of the river from about the 8th to the 23d of April, 1890. On and after the latter date, boats which had been cut down for the purpose could and did pass under the other fixed and uninjured span of the bridge, and were of sufficient capacity to carry all of complainants' freight to Nashville, Tenn. Before closing the channel of the river, the defendant arranged with the captain and superintendent of the only regular line of steamers or packet companies navigating the river, to place one or more boats below, and another or others above, the bridge, so as to continue regular trips, and transfer freight and passengers at the point of obstruction, by means of a barge anchored under the bridge, which means and method of transfer was continued during. the entire time the channel was closed. The agreement between the defendant and the said packet companies plying the river was to the effect that the former should pay the latter $600 per week, and that the latter should transfer all freight without extra charge to shippers; the intent of the agreement being to protect shippers against any increased charge or rate of freights because of the temporary obstruction to the ordinary navigation of the river. Under and in pursuance of this agreement with defendants, the steamers or packet companies maintained the usual and ordinary freight rate; and on the 23d of April, 1890, notified complainants that they were prepared and ready to carry or transport all their freight (chiefly corn in sacks) from the lower Cumberland and Ohio river to Nashville, without even transferring the same at the bridge; but complainants declined to ship that way, as they had previously declined to ship by boat, and allow this freight to be transferred at the bridge by means of the anchored barge. But from the 9th of April to some time in May, 1890, they had their freight carried or brought to Nashville by railroad, at an extra cost of 4 cents per 100 pounds. The additional freight rate thus paid by them on these shipments of grain, over and above the river rate, amounted to $1,800.41. Complainants furthermore intimate that they had paid out $500 for traveling expenses and extra labor, and sustained damage to grain in the sum of $242.64, on account of said obstruction of the river by defendant. These three amounts, aggregating the sum of $2,543.05, the special master has reported as the loss sustained by complainants, and which they are entitled to recover of the defendant, on account of its temporary interruption of the ordinary navigation of the river in rebuilding or repairing its bridge, as aforesaid.

The special master finds and reports that—

"Defendant could have rebuilt its draw-span by erecting its false work up and down the stream, thus leaving the span. open while the work was in progress; but this would have severed its line much more completely than the mode actually pursued severed the line of navigation, inasmuch as its passengers and freight would have had to be ferried over the river; an operation

attended with far more danger, delay, and expense than the transfer from one boat to another over the deck of a barge. The traffic of defendant's road also largely exceeds the traffic on the river, and the public convenience was therefore subserved by the mode of construction which was pursued."

The master's conclusion that the defendant is liable for the special loss or damage sustained by complainants, amounting, as reported, to $2,543.05, is based upon the theory "that, under the doctrine of the *Wheeling Bridge Case*, 13 How. 518, the state of Kentucky has no constitutional right to authorize an obstruction of the navigation of the Cumberland river," for the reason that said river was not wholly or throughout its entire length within the state of Kentucky, but traversed and bore the commerce of another state, (Tennessee,) which rendered it a navigable stream, subject to the exclusive jurisdiction of congress, under the commerce clause of the constitution, and that the building of a bridge across it could only be authorized or sanctioned by the general government, acting and speaking for the whole country. The master reached the conclusion, as the result of the supreme court's decisions on the subject, that in respect to navigable streams lying wholly and entirely within its limits, a state could authorize the building and continuance of bridges across the same until congress should act upon the subject; but that in respect to navigable water not wholly or entirely within the limits of a single state, but extending through or traversing two or more states, the absence of any action or regulation by congress was a declaration that such water should be and remain free from any and all control or obstruction by the state or states over the same, or any portion thereof. Applying this latter rule to the Cumberland river, the master reported that the state of Kentucky had no constitutional right or power to authorize the defendant to erect or maintain a bridge across the Cumberland river, although that portion of the river where the bridge crosses the same was wholly within the state; that the obstruction created in repairing or rebuilding the bridge was unlawful, and created a public nuisance; and that complainants were entitled to recover from defendant the special damage sustained in consequence thereof.

If these propositions and conclusions of the master are sustained by the authorities, the complainants are entitled to a decree for the special injury suffered by them in consequence of the temporary obstruction to the ordinary navigation of the Cumberland river.

The *Wheeling Bridge Case*, 13 How. 518, specially relied on to support the master's conclusion, does not control the present case. It will be seen, by reference to the leading opinion in the *Wheeling Bridge Case*, that the law of Virginia which authorized the erection of the bridge thus complained of was held to be inoperative chiefly on two grounds—*First*, because it impaired the obligation of the compact between Virginia and Kentucky that the use and navigation of the Ohio, so far as the territory of said states was concerned, should be free and common to the citizens of the United States; and, *second*, because it was in conflict with the legislation of congress, which has expressly sanctioned said compact, and thereby made it "a law of the Union." In the present case there is no

such compact between Tennessee and Kentucky in respect to the Cumberland river, nor has congress, under its constitutional authority, legislated on the subject.   The Wheeling bridge was in itself a permanent obstruction to navigation, while defendant's structure or false work was only a temporary and partial interruption to the usual course of navigation, with provision and arrangement made for the transfer of freight and passengers without extra charge to either, and without serious delay, risk, or danger.

The question as to whether the state of Kentucky had the constitutional right to authorize the erection of a bridge across the Cumberland river within its jurisdiction, and the consequent lawfulness or unlawfulness of defendant's temporary obstruction to navigation in rebuilding said bridge in order to restore its severed line, must, in the opinion of the court, be settled and determined by the principles announced in the cases of *Willson* v. *Creek Marsh Co.*, 2 Pet. 245; *Palmer* v. *Commissioners*, 3 McLean, 226; *Railroad Co.* v. *Ward*, 2 Black, 494; *Gilman* v. *Philadelphia*, 3 Wall. 721; *Pound* v. *Turck*, 95 U. S. 462; *Transportation Co.* v. *Chicago*, 99 U. S. 643; *Mobile* v. *Kimball*, 102 U. S. 691; *Transportation Co.* v. *Chicago*, 107 U. S. 687, 2 Sup. Ct. Rep. 185; *Miller* v. *Mayor, etc.*, 109 U. S. 385, 3 Sup. Ct. Rep. 228; *Cardwell* v. *Bridge Co.*, 113 U. S. 205, 5 Sup. Ct. Rep. 423; *Hamilton* v. *Railroad Co.*, 119 U. S. 281, 7 Sup. Ct. Rep. 206; *Huse* v. *Glover*, 119 U. S. 543, 7 Sup. Ct. Rep. 313; *Sands* v. *Improvement Co.*, 123 U. S. 293, 8 Sup. Ct. Rep. 113; and *Bridge Co.* v. *Hatch*, 125 U. S. 1, 8, 9, 8 Sup. Ct. Rep. 811.

It is not necessary to review these decisions.   While they establish beyond all question the paramount authority of congress, under the commerce clause of the constitution, over all navigable waters of the United States, they also settle the proposition that, until congress exercises its superior right of control and regulation, the states or state within whose territorial limits such waters or streams are located may directly, or through delegated authority, authorize the erection of bridges across the same, and that such structures are not unlawful until so declared by congress.   In respect to such structures over navigable waters within the limits of a state, non-action by congress is not a declaration that such waters must remain free and unobstructed, but that the state's authority over the same may be exercised to the extent, at least, of permitting and authorizing the establishment of ferries and the building of bridges over the same, necessary or convenient for either its local or interstate commerce.   Navigable waters lying within the limits of a state are both state and national in their character, with the paramount right of control or regulation in the general government when congress chooses to exercise the authority over the same; but, until such authority is exercised, the jurisdiction and power of the state to authorize the erection or construction of bridges over the same is clearly established.   But it is urged by counsel for complainants that such authority of the state is confined, as reported by the special master, to cases in which the navigable stream or water is located wholly, throughout its entire length, within the limits of the state.   It is true that in

most of the cases above cited the public or navigable waters were wholly within the limits of the state authorizing the erection of bridges or obstructions in or over the same, and that expressions are found in one or more of the opinions which apparently attach some importance to that fact. The decisions did not, however, proceed or rest upon that ground, but upon the principle that such portion of navigable waters as lay or were embraced within the limits or territorial jurisdiction of the state were subject to state authority, in respect to bridges over the same, until congress exercised its superior and paramount authority of regulation and control. Navigable waters entirely within the limits of a state stand upon the same footing and are subject to the same controlling authority of congress as those extending through or reaching beyond the state. The right of the state, in the absence of congressional regulation to the contrary, to authorize the erection of bridges over such portion of navigable waters as may be embraced within its limits, does not depend upon the length of such waters, nor is the state's authority restricted or affected by the fact that some portion of the stream may extend beyond its territorial jurisdiction. The commerce clause of the constitution includes control of all navigable waters of the United States, so far as may be necessary to insure their free navigation. By navigable waters are meant such as are navigable in fact, and which by themselves, or by their connections with other waters, form a continuous channel with foreign countries or among the states. *The Daniel Ball*, 10 Wall. 563; *Transportation Co. v. Chicago*, 107 U. S. 682, 683, 2 Sup. Ct. Rep. 185; *Miller v. Mayor, etc.*, 109 U. S. 395, 3 Sup. Ct. Rep. 228.

There is no distinction, under the commerce clause of the constitution, or in principle, between a navigable stream running through two or more states, and such a stream located wholly in one state, and connecting with other navigable waters, so as to form a continuous channel of communication with foreign nations or among the states. The decisions of the supreme court proceed upon no such distinction, nor do they, in our opinion, sanction or support the position contended for, that in the latter class of cases the state may authorize the construction of a bridge over the stream within its limits, but that in the former class the state has no such authority. The theory upon which this contention is based is that navigable waters wholly within the limits of a state, but connecting with other waters, forming continuous channels of communication with foreign nations or among the states, are not so "national" in in their character as navigable streams extending through two or more states. This position is not correct, neither is it supported by the authorities. On the contrary, the adjudged cases recognize no such distinction in respect to bridges and other structures erected over navigable waters under state authority. While the decisions of the supreme court establish the general doctrine, as stated by Mr. Justice FIELD in *Cardwell v. Bridge Co.*, 113 U. S. 210, 5 Sup. Ct. Rep. 423,—

"That the commercial power of congress is exclusive of state authority only when the subjects upon which it is exerted are national in their character, and admit and require uniformity of regulations affecting alike all the states;

and that when the subjects within that power are local in their nature or operation, or constitute mere aids to commerce, the states may provide for their regulation and management until congress intervenes and supersedes their action,"

—they also establish that bridges over navigable waters are not of such national character as to exclude state action in respect thereto, but are, on the contrary, of such local, limited, and special character, as aids to commerce, as to come within the management and authority of the states "until congress intervenes and supersedes this action." This is clearly pointed out in *County of Mobile* v. *Kimball*, 102 U. S. 698, 699, and *Railway Co.* v. *Illinois*, 118 U. S. 585, 7 Sup. Ct. Rep. 4, and recognized in all subsequent cases, down to and including *Bridge Co.* v. *Hatch*, 125 U. S. 1–17, 8 Sup. Ct. Rep. 811.

The subjects which have been considered of such national character as to require uniformity of regulation, and to exclude all state action and control, are those relating to interstate and foreign commerce, and the instrumentalities employed therein,—such as the imposition of taxes or other restrictions upon or interference with such commerce. In respect to all such subjects, non-action by congress is tantamount to a declaration that they shall remain free and unobstructed by state action. The cases of *Welton* v. *Missouri*, 91 U. S. 275–280; *Ferry Co.* v. *Pennsylvania*, 114 U. S. 196–204, 5 Sup. Ct. Rep. 826; *Pickard* v. *Car Co.*, 117 U. S. 34, 6 Sup. Ct. Rep. 635; and *Railway Co.* v. *Illinois*, 118 U. S. 557–575, 7 Sup. Ct. Rep. 4,—furnish illustrations of the subjects considered of national importance, and requiring such uniformity of regulation as to exclude state action and regulation. But the principle of these cases has never been extended to local structures, such as bridges erected by state authority on or over navigable waters which lie wholly within the limits of the state at the point or locality where such structures are erected. But for the commerce clause of the constitution, the state of Kentucky would have exclusive jurisdiction and authority over that portion of the Cumberland river situated within her territorial limits. Her power over it would be as full, complete, and extensive as though the river, throughout its entire length, lay wholly within her borders. As a member of the Union, her sovereign right over the river, as a navigable stream of the United States, is limited by the power conferred upon the general government to regulate commerce among the states. The delegated and paramount authority of congress is confined to regulation of such waters as highways of commerce, leaving the sovereignty of the state over the same otherwise intact and unimpaired. See *Pollard* v. *Hagan*, 3 How. 223; *Bridge Co.* v. *Hatch*, 125 U. S. 1–12, 8 Sup. Ct. Rep. 811. But subject to this power of regulation, and until it is called into exercise by congress, the state of Kentucky had the right to sanction and authorize the building of bridges across the stream to aid and facilitate her local and interstate commerce. The bridge, as originally constructed, and after being restored in June, 1890, was not an unlawful interference with navigation. The method employed to restore or rebuild it was not an unreasonable obstruction or interruption of navigation, under the authority

lawfully conferred to build and maintain it. The line of road of which it formed an essential part was and is both a state and national highway, just as the Cumberland river is. The traffic over the road, as reported by the master, exceeds that on the river. The public convenience and benefit were subserved by the mode of rebuilding the bridge which defendant adopted. In rebuilding its bridge, in pursuance of authority conferred by law for the benefit of the public, and without unreasonably or unnecessarily obstructing navigation of the river, it cannot be held that defendant created a public nuisance such as will entitle complainants to recover of it the special damages which they claim to have sustained. This conclusion is clearly and fully supported by the cases of *Transportation Co.* v. *Chicago,* 99 U. S. 635; *Hamilton* v. *Railroad Co.,* 119 U. S. 280-285, 7 Sup. Ct. Rep. 206; and *Green & B. R. Nav. Co.* v. *Chesapeake, O. & S. W. R. Co.,* 88 Ky. 1-12, 10 S. W. Rep. 6.

What was said and ruled by this court in *Railway Co.* v. *Backus,* 46 Fed. Rep. 216, in nowise conflicts with the views herein expressed and conclusions reached. The proposed structure there complained of came directly within the act of congress approved September 19, 1890. The temporary obstruction here complained of was erected and removed before that legislation of congress was enacted.

It may be proper to state that, if complainants could recover at all, they could not be allowed the amount reported by the master in their favor. The two items of $500 for traveling expenses and extra labor, and $242.64 for damage to grain, are not shown to have been occasioned by, or to have been the direct, necessary, and proximate result of, the defendant's temporary or partial obstruction of the usual navigation. In respect to the item of $1,800.41 for extra freight paid by them, the proof shows that this was largely, if not wholly, self-imposed. No valid reason is given for not transferring their freight over or across the barge provided for the purpose, under the arrangement made between the defendant and the superintendent of the packet companies plying the river. Such transfer would have cost them nothing, would have been attended with but little delay, and would have involved little, if any, more risk or exposure of the freight than the method of shipment adopted by them. On and after the 23d of April, 1890, complainants could have shipped their freight by the river, and were offered transportation that way, without extra charge. It does not appear that they had previously made and entered into any binding contracts to ship by other route or routes, such as would have prevented their acceptance of Capt. Rymin's proposition to carry this freight by the Cumberland river, as usual. But, without further reference to the matter or question of actual damage sustained, the court is clearly of the opinion that, upon well-settled principles, the complainants are not entitled to recover anything under the facts and circumstances of this case. It follows that their exceptions to the report of the special master should be overruled, that defendant's 2d, 3d, 4th, and 5th exceptions be sustained, and that complainants' bill should be dismissed, with costs to be taxed, including an allowance to the special master. It is accordingly so ordered and adjudged.