# DECISIONS

OF THE

# COURT OF APPEALS OF KENTUCKY,

SEPTEMBER TERM, 1888.

CASE 1 —PETITION ORDINARY—DECEMBER 11, 1888.

## Green & Barren River Nav. Co. v. Chesapeake, Ohio & Southwestern Railroad Co.

APPEAL FROM LOUISVILLE LAW AND EQUITY COURT.

1. OBSTRUCTION OF NAVIGATION.—A State Legislature may authorize the building of a bridge or other structure tending to obstruct the navigation of a navigable river which is altogether within its own boundary, so long as Congress does not interfere.

2. SAME.—The appellant, under its lease from the State of the "Green and Barren river line of navigation," acquired no peculiar right in the navigation of these streams, but merely the exclusive proprietorship, during the lease, of the improvements made by the State. Therefore, the grant to a railroad company to bridge these streams, "so as not unreasonably to obstruct navigation," was valid as against appellant; and appellant can not complain of the obstruction of navigation by the railroad company in repairing a bridge constructed under this grant, the repairs being made in such a way "as not unreasonably to obstruct navigation."

WRIGHT & McELROY AND ALEX. P. HUMPHREY FOR APPELLANT.

1. By legislative acts in 1868, and a lease from the State to appellant in pursuance thereof, the appellant acquired, for a valuable considera-

2        KENTUCKY REPORTS.        [VOL. 88.

Green & Barren River Nav. Co. v. Chesapeake, O. & S. W. R. R. Co.

tion, a vested contract right to use the line of navigation of Green river, and to navigate that river for thirty years. The State thereby agreed that appellant should have the absolute right (in consideration of its keeping up the locks and dams, etc.) to run its boats for thirty years, without any reservation to the State of the right to obstruct such use by subsequent legislation. (Acts 1867-8, volume 2, page 599; Commissioners Sinking Fund v. Green & Barren River Nav. Co., 79 Ky., 79; McReynolds v. Smallhouse, 8 Bush, 454.)

2. The general right of the State to authorize the obstruction of its internal rivers by bridges, is not applicable to a case in which the State has thus agreed that the appellant's right to navigate the river for thirty years should be unobstructed. Subsequent legislation could no more destroy partially appellant's contract right to navigate said river for thirty years, than it could wholly destroy it. And subsequent legislation should be so construed as to be consistent with, and so as not to be partially or wholly obstructive to, or destructive of, said vested contract right of appellant.

3. The subsequent legislative grant to appellee of the right to build bridges over the streams in the line of its contemplated road, must, as to Green river, be construed in harmony with and in subordination to the previously existing contract rights of appellant; and, so construed, it gave no implied right to appellee to obstruct appellant's navigation of said river.

4. The findings of fact show that appellee "could have entirely avoided the obstruction of the navigation of the river by opening the draw-span and erecting false work along the bank of the river upon which the draw-piers stood." And, although this mode of construction would, perhaps, have involved some greater time and expense to appellee, and a temporary severance of its line of road, and the use of a ferry transfer, it was the duty of appellee to adopt that feasible plan, and to endure the additional cost and temporary break in its own line, for its own purposes; and not to adopt the mode of building which would shift the break to appellant's line, and shift the loss on appellant. (Memphis R. R. Co. v. Hicks, 5 Sneed (Tenn.), 428; Lester v. Newark Railroad Co., 36 New Jersey Equity, 478; State v. Dibbell, 4 Jones' Law (North Car.), 107.)

5. It being shown that appellee could, by some additional cost and inconvenience to itself, build the bridge without obstructing the navigation at all, it was "unreasonable" for appellee to refuse to adopt that plan; and the appellee is liable for the loss caused to appellant by such unreasonable obstruction.

JOHN MASON BROWN AND GEORGE M. DAVIE FOR APPELLEE.

1. In the absence of prohibitory congressional legislation, the State Legislature had unlimited power to authorize the building or repair of a

VOL. 88.]  SEPTEMBER TERM, 1888.  3

Green & Barren River Nav. Co. v. Chesapeake, O. & S. W. R. R. Co.

bridge over a river wholly within the State, although its erection would obstruct or even destroy navigation. (Hamilton v. Vicksburg Railroad, 119 U. S., 280; Wilson v. Blackbird Bridge Company, 2 Peters, 245; Cardwell v. Bridge Company, 113 U. S., 205; Transportation Company v. Chicago, 99 U. S., 635; Cooley's Const. Lim., side-page 542; Commissioners Sinking Fund v. Green and Barren River Navigation Company, 79 Ky., 82.)

2. The power of the Legislature to authorize the obstruction of navigation by this bridge was not affected or lessened by the lease from the State to appellant. That lease was not a lease of the river, nor was it a grant of any exclusive, or superior, or other rights of running boats on said river, but was only a lease of the locks and dams, and a grant of a franchise to exact tolls of all boats that should use said locks and dams. The appellant had no other or different rights to ply boats on said river than any other person, or than the public generally had; and the State had the same right to obstruct appellant's boats as the boats of others, by building bridges. (Acts 1867-8, vol. 2, page 599; Green and Barren River Navigation Company v. Palmer, 83 Ky., 646; Commissioners Sinking Fund v. Green and Barren River Navigation Company, 79 Ky., 80.)

3. The grant by the Legislature to appellee of the right to build and operate its road from a point on one side of Green river to a point on the other side, was an implied grant of the right to build and to keep in repair a bridge to cross said river; and was an implied grant of the right to obstruct the navigation of said river to the extent that was necessary for such building and repairing. (Wood's Railway Law, vol. 2, page 958.)

4. The Legislature made an express grant to appellee of the right to build such bridges, provided it did so in such manner "as not unreasonably to obstruct the navigation."

This authorized obstructions to any extent that did not become unreasonable; and as the appellee built its bridge in a usual proper and expeditious manner, the necessary obstruction thereby occasioned was not unreasonable. (Acts 1881, vol. 1, page 258, section 1; Acts 1878, vol 2, page 112, section 19; Silliman v. Hudson River Bridge, 4 Blatchford, 412.)

5. The Legislature having full power to authorize the obstruction necessary for the building of the bridge, and it having enacted a law authorizing such obstruction, and the bridge having been built within the bounds of that law, there is no liability upon appellee for losses to steamboatmen thereby occasioned; but it is *damnum absque injuria*. (Hamilton v. Vicksburg Railroad, 119 U. S., 285; Transportation Company v. Chicago, 99 U. S., 641; Cooley's Const. Lim., side-page 542; Sprague v. Worcester, 13 Gray, 194; Mellen v. Western Company, 4 Gray, 303.)

6. The appellee was not required to adopt any unusually difficult or rapid or expensive plan for building the bridge, but was entitled to build it in the usual and reasonably rapid and cheap way, although the obstruction to navigation might be less if built in the unusual and more costly way. (Rowe v. Granite Bridge Company, 21 Pickering, 348; Hamilton v. Vicksburg Railroad, 119 U. S., 285.)

JUDGE HOLT DELIVERED THE OPINION OF THE COURT.

The Legislature of Kentucky chartered the Memphis, Paducah and Northern Railroad Company on March 25, 1878. It also incorporated the Chesapeake, Ohio and Southwestern Railroad Company on January 19, 1882.

The last named corporation was, at the time of its creation, the owner of so much of the first named road as had then been constructed from Memphis, Tennessee, to Paducah, Kentucky, and its charter conferred upon it certain powers and privileges that had been granted to the Memphis, Paducah and Northern Railroad Company.

The charter provision of the last-named corporation which was, by reference to it in the appellee's charter, made a part of it, and which is material to the proper consideration of the questions now presented, is as follows:

"SEC. 19. The Board may provide for the construction of telegraph lines, workshops, warehouses, *bridges* (*so as not unreasonably to obstruct the navigation of any navigable stream*), and other buildings and erections, and for conducting them and such other operations as may be necessary and convenient to the most efficient operation of the railroad of the company for the common carriage of freights and passengers."

Prior to 1883, the appellee's road had, in conformity

to its charter, been extended from Paducah northward to Louisville; and as a part of this extension, and under its legislative grant, the company had erected across the Green river at Rockport, in this State, a bridge with a revolving or draw-span, so as to admit of the passage of boats and other craft navigating the river. In November, 1883, it became necessary to replace this draw-span with a new and more improved one, and to this end the appellee caused notice to be published that it would close the channel of the river under the span from December 5 to about December 31, 1883. It also had notice of its intention to do so served upon the appellant, the Green and Barren River Navigation Company, a lessee from the State under an act approved March 9, 1868, of the locks, dams and other improvements erected by it upon Green and Barren rivers, and the owner of a line of steamboats plying upon these waters between Bowling Green, in this State, and Evansville, Indiana. There is no complaint of want of proper notice.

Accordingly, the railroad company, over the protest of the navigation company, closed the draw-span by the erection of false work under it, and it thus remained until January 22, 1884, a period of forty-seven days. No unnecessary time was consumed, however, in the erection of the work, and during fifteen of the forty-seven days navigation was prevented upon the appellant's line by ice in the Ohio river.

The lower court, in its finding of facts, found that the obstruction of navigation might have been altogether avoided by throwing open the draw-span and erecting the false work along the river bank, upon the

edge of which the draw-pier stood. Doubtless this would have been possible, but it would not only have severed the railroad, but have been an unusual mode of erecting such structures, requiring more time for its completion, and involving fifty per cent., or, at least, a much greater cost.

While the navigation was thus obstructed, the navigation company continued the operation of its line, save when prevented by ice, by running one of its boats upon the upper and the other upon the lower end of it, and by transferring its passengers and freight from one boat to the other, over the deck of a barge anchored under the bridge. It brought this action to recover damages consequent upon the obstruction.

The lower court found that it caused one of the appellant's boats to remain idle and partially manned at Rockport during the closing of the span, at an expense of one thousand five hundred and eighty-five dollars and twenty-five cents. We fail to understand why this was either a necessary or a reasonable result. The bridge was not far from the middle point upon its line of navigation. It seems to us that one boat could have been constantly plying between the bridge and one end of the line, and the other between the bridge and the other end, the two meeting at the bridge, thus avoiding the detention of one boat at the bridge while the other went from it to the other end of the line and returned. As it was a finding of fact, however, we will regard it as well founded.

The judge below also found that a reasonable rent of the barge, etc., was one thousand five hundred and

fifty-one dollars, thus fixing the entire damage at something over three thousand dollars ; but he dismissed the claim upon the ground that the legislative grant to the railroad company to make the improvement was valid, and that it, in doing so, had kept within its terms.

The Green and Barren rivers are navigable streams, and entirely within the boundary of this State.   They are public highways by nature or of common right. They exist by common law, and the public can only be deprived of their free use by legislation.   Although they are national as well as State highways, and beside serving the purposes of internal commerce, also facilitate commerce between the States, yet it is well settled that, in the absence of legislation under that clause of the Constitution of the United States giving to Congress the power to regulate commerce between the States, a State has plenary power over a navigable stream altogether within its borders.   In such a case, until Congress intervenes, the Legislature of the State is sovereign.   It may, as to such a stream, and in the absence of national legislation, enact a law which incidentally may have a material influence upon commerce between the States.   Such a river is not outside of State jurisdiction so long as Congress does not interfere.

The mere grant of the power to the national legislature to regulate commerce between the States is not *per se* an inhibition upon State legislation as to a navigable river entirely within its boundary.   It is quite proper that it should, in such a case, regulate its internal commerce as a part of its internal police.

The Supreme Court of the United States, speaking

upon this subject in the case of Hamilton v. Vicksburg, &c., Railroad, 119 U. S., 280, said: "As has often been said by this court, bridges are merely connecting links of turnpikes, streets and railroads, and the commerce over them may be much greater than that on the streams which they cross. A break in the line of railroad communication from the want of a bridge, may produce much greater inconvenience to the public than the obstruction to navigation caused by a bridge with proper draws. In such cases the local [authority can best determine which of the two modes of transportation shall be favored, and how far either should be made subservient to the other."

We regard it as now settled beyond question that a State Legislature may, at least, authorize the building of a bridge or other structure tending to obstruct the navigation of a navigable river which is altogether within its own boundary; and it is only when Congress, by virtue of the constitutional provision, acts as to such obstructions, that its will must be obeyed, so far as may be necessary to insure free navigation. (Wilson, &c., v. The Blackbird Creek Marsh Company, 2 Peters, 245; Transportation Company v. Chicago, 99 U. S., 635; Cardwell v. Bridge Company, 113 U. S., 205; Hamilton v. Vicksburg, &c., Railroad, *supra*.) In fact many of the cases hold that the obstruction may go to the extent of entirely destroying the navigation of the stream.

The appellant contends, however, that it stands in a different attitude from the general public as to the right of the State to obstruct Green river, or to authorize it to be done by the building or repairing of a

bridge. It insists that the Legislature had no right, after making and during the continuance of the thirty years' lease to it, to pass any law repealing or abridging the privileges conferred by it, because to do so would impair the obligation of the contract, and that the State can not obstruct its navigable stream, or author- ize it to be done, if Congress has legislated as to it under the commerce clause, or if to do so would vio- late a contract made by the State with an individual or a corporation. It becomes necessary, therefore, to ascertain what rights the appellant did, in fact, acquire by its lease.

The rights of the parties to this controversy are not to be determined by the relative importance of river or railroad transportation to the commerce of the country. We have no right to compare benefits or contrast injuries. Whether one, and if so, which one, is to be subservient to the other, is a question addressed to the Legislature and not to the judiciary.

Prior to March 9, 1868, the State had improved the navigation of Green and Barren rivers by means of locks and dams, and tolls were charged for their use. The money thus realized proved inadequate to maintain and operate the improvements, and the enterprise was a losing one to the State. The Legislature, by an act of the date last-named, incorporated the appellant, and, in the language of the second section of the act, leased to it the "Green and Barren river line of navigation and their tributaries, together with the grounds, houses, water-works, rents, profits, tools, machinery, implements and appurtenances, and all the franchises thereunto belonging or appertaining." The act re-

quires the company to keep "the line of navigation" in repair, and to permit all water craft to navigate the rivers upon the payment of certain rates of toll prescribed by it.

The constitutionality of this act, and the validity of the lease based upon it, were maintained by this court in the two cases of McReynolds, &c., v. Smallhouse, 8 Bush, 447, and Commissioners Sinking Fund v. Green and Barren River Navigation Company, 79 Kentucky Rep., 73.

What, then, was the extent of the property right thus acquired by the appellant? Manifestly it did not confer upon it an exclusive right of navigation. It was not a lease of the rivers themselves. The company did not, during the term of the lease, acquire such a right in them as it would have obtained under a lease of a canal or turnpike. The public had a natural right to use them before the State improved them. They were not the subjects of private ownership. The company acquired no exclusive right of fishing in them, or using the water for motive or irrigating purposes.

What, then, was intended by the expression, "line of navigation," as used in the act? The history of the matter and the existing circumstances will serve to explain it. The rivers themselves were navigable streams, open to public use by common right. The State had, however, erected locks and dams and other subsidiary improvements. Tolls were being charged for their use by the State when the lease was made. These improvements belonged to it, and not to the public by any common right. They constituted its line of navigation; and it leased what belonged to it

in its corporate capacity as distinguished from what was subject to public use under common right. Properly speaking, these improvements were all the State had to lease; and although the grant should be construed strictly, yet a fair interpretation of the act of the Legislature confines its operation to the property of the State.

The fourth section requires the company "to use due diligence in keeping up said line of navigation in good repair." These words certainly refer to the improvements only, and aid us in reaching a conclusion as to what was meant by the words "the line of navigation."

The company acquired no peculiar right in the navigation of these rivers under its lease. As to it the appellant occupied the same attitude as the general public; and as none of the improvements have been injured or interfered with, and as the license to bridge the river was valid against the public, it results that the appellant can not complain if the appellee, in repairing its bridge, has kept within the grant. It is not a case of two interfering franchises, because the contract between the State and the navigation company invested the latter with the exclusive proprietorship during the lease of the improvements only, and not the navigation of the river. This court, in effect, so held in the case of the Navigation Company v. Palmer, 83 Ky. Rep., 646; and it is unnecessary to consider the question of the power of the State to barter away the control of its navigable streams, which is a part of its internal police power, because it has not attempted to do so in this instance.

It is reasonable to suppose that the parties so understood the contract.

If the bridge had not been constructed when the lease was made, then the acquiescence of the appellant in its construction under legislative grant, and the knowledge that it would necessarily need repair, shows how it regarded the contract. Upon the other hand, if it had already been constructed, then the company knew that its repair and renewal would follow as a duty to the traveling public, and as necessary to its convenience and safety; and it is unreasonable to suppose that the parties intended to enter into a contract forbidding such repair.

The work was done at a season of the year when it was likely to interfere with navigation the least. Ample notice was given that it would be done; and it was done as expeditiously as possible. In fact, it is not claimed that there was any unreasonable delay, or that the obstruction continued longer than was necessary.

It is plain that nothing was done negligently or wantonly, but that the appellee acted in good faith, and with proper precaution. While it was possible to have opened the draw and constructed the new one upon the edge of the river, and thus have avoided all obstruction to navigation, yet the railroad company was not required to take an unusual course in constructing its improvement, and one which would involve unreasonable delay and expense. It was done in such a manner as "not unreasonably to obstruct the navigation," and the appellee is entitled to the protection of the rule of *damnum absque injuria*.

Judgment affirmed.