## Natcher et al. v. City of Bowling Green et al.
(Decided June 2, 1936.)

MILLIKEN & MILLIKEN for appellants.

RODES & HARLIN, J. FRANK DENTON and JOHN B. RODES for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER —Reversing.

The suit is by the appellants, Blanche G. Natcher and husband, seeking to compel the removal by the city of Bowling Green and its officers of a dam erected across Barren river and to recover damages for the consequent destruction of her gravel bars. The judgment went for the defendants.

Barren river forms the northern boundary of Bowling Green. In the northeast corner of the city is the pumping station of the municipal waterworks, and above and adjoining it outside the city limits is the property of the plaintiff. For a great many years the city and its predecessor owner of the water system have obtained the supply from a natural pool at this point. It is about 18 feet deep, and extends nearly or all the way across the river, which is nearly 200 feet wide. Just above this are three gravel and sand bars from which material has been taken for many years. Title to two of these bars was adjudged to be in Mrs. Natcher's remote vendor in Strange v. Spalding, 29 S. W. 137, 17 Ky. Law Rep. 305. In the natural and seasonable flow of the river these bars or islands were submerged perhaps half the time. During the other part of the year they normally stood well out of the water, and the owner was able to send in wagons and haul out the gravel. During part of this time there was practically no channel or flow between them and the shore. The plaintiffs' evidence shows that there is an unusually valuable combination of gravel and sand, sufficient for concrete work without cleaning or further mixture, and that the proceeds from the sales of gravel have been $900 a year. The effect of the dam has been to submerge the bars 3 feet or more during the lowest tides. The plaintiffs' proof is that not only does this prevent or hinder getting out the gravel, but it has destroyed the value of the deposits because of the change in the current, with consequent diversion of the accretions and the forming of sediment on them. The defendants' proof minimizes the values and damages.

In and on a navigable stream, the title of riparian owners up to the ordinary high-water mark, and particularly of the bed and islands therein, is a qualified one, for it is subject to the dominant rights of the public in the stream. Navigable rivers are and have always been regarded as public highways. If the sovereign in the exercise of its power improves the stream for purposes of navigation, the individual's rights of property recede before the paramount power of improvement and development. 27 R. C. L. 1335, 1338; Terrell v. City of Paducah, 122 Ky. 331, 92 S. W. 310,

28 Ky. Law Rep. 1237, 5 L. R. A. (N. S.) 289; Paducah Sand & Gravel Co. v. Central Home Tel. & Teleg. Co., 209 Ky. 756, 273 S. W. 481; Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U. S. 82, 33 S. Ct. 679, 57 L. Ed. 1083, Ann. Cas. 1915 A, 232.

The legal conflict has been waged ably and exhaustively around the major point of whether Barren river at and above the city is a navigable stream. Up to what is called the "boat landing," about 12 miles by the river, but only a mile or so from the city by land, due to a big bend in the stream, the United States government has control, and steamers traverse it, or did so until quite recently. Above that point and far beyond Bowling Green to the mouth of Bays Fork, where there was once a village called Martinsville, a hundred years or so ago the river was navigated. The Legislature in 1809, 1810, and 1824 empowered certain individuals to raise funds by subscription and remove obstructions to navigation up to that point. 4 Littells' Laws, p. 116; Acts of 1823, p. 408. In 1834 and 1835 acts were passed providing for the improvement of navigation on this river, and in 1868, the Green and Barren River Navigation Company was chartered. Acts of 1834, p. 497; Acts of 1835, p. 286; Acts of 1868, p. 599. However, there has been no navigation above the boat landing, except perhaps in insignificant proportions by canoes or skiffs, for many many years. The stream is a succession of pools and gravel bars above that point, and the evidence shows it is impossible of convenient navigation even for such small craft. But the city maintains it is historically and potentially a navigable stream. Whether it is to be now deemed a navigable stream under the tests laid down by the authorities is a question which, it seems to us, may be avoided. We will accept the contentions of the city and the judgment of the trial court that it is in law a navigable stream. But it is extremely doubtful. See United States v. Cress, 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746, reviewing Kentucky and many other cases; Mayor and City Council of City of Havre de Grace v. Harlow, 129 Md. 265, 98 A. 852, 857; Murray v. Preston, 106 Ky. 561, 50 S. W. 1095, 21 Ky. Law Rep. 72, 90 Am. St. Rep. 232.

After the American Revolution all the proprietary

rights of the crown and Parliament in and all dominion over navigable waters and the soil under them vested in the several states, subject to the powers surrendered to the federal governmnt by the Constitution of the United States. Scott v. Lattig, 227 U. S. 229, 33 S. C. 242, 57 L. Ed. 490, 44 L. R. A. (N. S.) 107; Appleby v. City of New York, 271 U. S. 364, 46 S. Ct. 569, 70 L. Ed. 992; People v. Welch, 141 N. Y. 266, 36 N. E. 328, 24 L. R. A. 117, 38 Am. St. Rep. 793; Water & Water Rights, Farnham, secs. 10, 11; 45 C. J. 492. A state may exercise plenary control over the navigable waters within its limits up to the ordinary high-water mark in the absence of action by Congress or its agency under the commerce powers of the Federal Constitution (Const. art. 1, sec. 8, cl. 3). However, when private property is taken, it is in subordination to the constitutional provisions respecting compensation. North Shore Boom & Driving Co. v. Nicomen Boom Co., 212 U. S. 406, 29 S. Ct. 355, 53 L. Ed. 574; United States v. Cress, 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746; 27 R. C. L. 1325; Green & Barren River Navigation Co. v. Chesapeake, Ohio & Southwestern R. Co., 88 Ky. 1, 10 S. W. 6, 10 Ky. Law Rep. 625, 2 L. R. A. 540.

The United States government has assumed no control of the river at the point involved and is not concerned in this matter.

The state of Kentucky by statute governing the city of Bowling Green and other cities of the third class has delegated its dominion to those cities by granting to their common councils the power "to improve and preserve the navigation of any navigable rivers within or adjoining said city." Section 3290-30, Kentucky Statutes. That is at once a grant and a limitation.

The vital question is whether the city erected this dam under the delegated authority of the state and for the purpose of improving or preserving navigation. When the city was rebuilding its waterworks some time in 1928, the consulting engineers recommended that a dam be built in order to increase the supply. During the unprecedented drought of 1930 there was anxiety on the part of the officials concerning the future water

supply, and some thought was then given to erecting a temporary dam. However, in obedience to a proclamation of the mayor asking for economical use, and conservation, there was a substantial decrease in the consumption, and it became unnecessary to do anything further. In 1932, the same engineers renewed their recommendation as to the dam. In the spring of 1933, the city foreman, under orders of the board of public works and with labor paid by the national government, laid a dam across the river about 300 feet below the pool and 2,800 feet from the appellants' gravel bars. It is about 6 feet in height and built of loose rocks and boulders obtained at the site. As stated above, the effect is to back up the water and cover the appellants' gravel bars 3 feet or more at the lowest stages of the river. There was no formal action of the city council at the time the dam was constructed. It was not laid in front of the city's property, but permission was obtained from W. A. Francis, who owned both shores and the bed of the stream at that point. Francis owns gravel bars immediately below the dam, and the city and county have been getting out gravel under a co-operative arrangement to the mutual benefit of all three. The Honorable John B. Rodes, who was mayor of Bowling Green at the time, testified that there was a threefold purpose in building the dam: First, to obtain the benefit of Francis' gravel bar; second, to secure the depth and capacity of the pool for the intake of the pumping system of the waterworks; and, third, "the improvement in the navigation of the river." This last-stated purpose must be considered in the light of Mr. Rodes' entire testimony which, on this point, was in effect that the dam created slack water for perhaps two miles, thus affording facilities for skiffs, canoes, and motorboats. Later in his testimony he said that it was for recreation and navigation. It does not appear that there has been any substantial use of the pool by even the small pleasure craft, but it is used as a public bathing resort.

The foreman in charge of the work under the supervision of the mayor testified that it was not bulit to create a swimming pool or to increase navigability or to enable the city to get gravel below the dam, but that it was for the "benefit of the water works; to raise the

pool so as we would have sufficient water there in the lower tides." Of course the witness could not determine the purpose or the policy of the city, but his testimony reflects the current primary reason for erecting the dam. A member of the board of public works declared the purposes were to "facilitate the method of getting the water out," and also "to create slack water there that could be used for boating, navigation and small boats." In September, 1933, the minutes of the board of public works record that Natcher requested that the dam be removed, but consulting engineers and the city engineer advised against its removal because of the effect on the waterworks system. However, a few days later the board agreed that an opening should be made in it temporarily in order to enable Natcher to get out some gravel. This was done, but the breach was soon restored.

It was not until May, 1934, one year after the dam had been built, that there was any formal action taken by the city council in relation to this matter. An ordinance was then enacted "providing for the maintenance" of the dam. The preamble recites that:

"Whereas, it is necessary in order to improve and preserve the navigation of Barren River in and adjoining Bowling Green, Kentucky, the said stream being a navigable river, and,

"Whereas, the said dam is necessary to be maintained at approximately its present height in order to provide a pool of water sufficient depth to supply the needs of the pumping station located just above said dam and the necessities of the people of Bowling Green, and,

"Whereas, said dam is otherwise a valuable asset to said city and provides a slack water for some two miles above and to the east of the city upon which skiffs, canoes, motor boats and other small craft may ply."

It was then ordained that the dam should be maintained by the city. We may proceed on the assumption that this effectually ratified the original construction for the purposes stated.

Here is a singular, inconsistent condition, for as

a matter of fact the dam obstructs general navigation. There was no provision for the passage of boats. There was no need to have obtained the consent of the owner of the shores and the bed of the stream at the dam site if the construction was to improve navigation, for, as stated, the city had the right to do that in its proprietary sovereign capacity regardless of the owner's attitude.

The conclusion is inescapable that this dam was erected to improve the facilities of the waterworks system and that the improvement of navigation, even for the small canoes and skiffs, was purely incidental and a very minor consideration. Even the accomplishment of such collateral purpose would not and did not "improve navigation" in the eyes of the law. In the legal test of navigability of a stream, it is generally held that the fact of its sufficiency for pleasure boating or for hunters or fishermen to float their skiffs or canoes does not make it navigable in law as "to be navigable a water course must have a useful capacity as a public highway of transportation." Harrison v. Fite (C. C. A.) 148 F. 781, 782; 27 R. C. L. 1312. The use of a stream by a boat a few times in many years for a picnic or excursion cannot be deemed a navigation. People v. New York, O. & W. R. Co., 133 App. Div. 476, 117 N. Y. S. 1048. The true criterion of navigability of a river is whether it is generally and commonly useful for some purpose of trade or commerce or a substantial and permanent character, for, if this were not so, "then there is scarcely a creek or stream in the entire country which is not a navigable water of the United States. Nearly all the streams on which a skiff or small lugger can float discharge themselves into other streams or waters flowing into a river which traverses more than one state, and the mere capacity to pass in a boat of any size, however small, from one stream or rivulet to another * * * [is not] sufficient to constitute a navigable water of the United States." Leovy v. United States, 177 U. S. 621, 20 S. Ct. 797, 801, 44 L. Ed. 914; United States v. State of Utah, 283 U. S. 64, 51 S. Ct. 438, 75 L. Ed. 844.

In Mayor, etc., of City of Havre de Grace v. Harlow, supra, the matter of navigability through the erection of a dam was involved. It was there said:

592

"The effect of these dams will necessarily be to cause pools of backwater to be formed, across which some ferryboats may be operated; but it has more than once been held that the operation of a ferry across a stream does not constitute such stream a navigable water throughout its length, nor do pleasure boats, whether rowboats or power launches, operated on such slack water constitute commerce within the meaning of that term as applied to navigable streams. Baldwin v Erie Shooting Club, 127 Mich. 659, 87 N. W. 59; Harrison v. Fite, 148 F. 781, 78 C. C. A. 447; People v. Economy L. & P. Co., 241 Ill. 290, 89 N. E. 760."

Hence a purpose to create a pool navigable only by small craft for pleasure of recreation cannot be regarded as a purpose to improve or aid navigation.

The only authority the city has under its delegated dominant right, the exercise of which will not make it answerable in damages to riparian owners is "to improve and preserve the navigation" of the river. But the fact that purposes other than navigation will also be served cannot invalidate the exercise of authority conferred even if they alone would not have justified an exercise of the power. State of Arizona v. State of California, 283 U. S. 423, 51 S. Ct. 522, 75 L. Ed. 1154. When, however, under the plea of the improvement of navigation the property of a riparian owner is taken or its value diminished by a public work unrelated to the purposes of navigation and not within but wholly without the channel of the river and its public servitude, there is a clear case for the enforcement of the constitutional guaranty of compensation. 20 C. J. 662; 45 C. J. 493; 27 R. C. L. 1336; Fulton Light, Heat & Power Co. v. State, 200 N. Y. 400, 94 N. E. 199, 37 L. R. A. (N. S.) 307; Hewitt-Lea Lumber Co. v. King County, 113 Wash. 431, 194 P. 377, 21 A. L. R. 201; United States v. Cress, supra. A municipality may not accomplish objects not intrusted to it under the pretext of executing powers which are. Cf. Ashwander v. Tennessee Valley Authority, 56 S. Ct. 466, 80 L. Ed. —. We are therefore constrained to hold that the erection of the dam was not under the dominant proprietary power of the city in the stream "to improve or preserve navigation," which had been con-

ferred upon it by the state. Subject to such an exception, an upper riparian proprietor has a right to have the stream flow in its natural way, and the lower proprietor may not interfere with it or cause it to back up and collect on his land. Anderson v. Cincinnati Southern Ry., 86 Ky. 44, 5 S. W. 49, 9 Ky. Law Rep. 303, 9 Am. St. Rep. 263; Judd v. Blakeman, 175 Ky. 848, 195 S. W. 119; Franz v. Jacobs, 183 Ky. 647, 210 S. W. 163.

The flooding and submersion of appellants' gravel beds was a direct encroachment upon their land, and restricted, if it did not actually exclude, their dominion or control over it. This constituted a taking of private property by the city, and it must make compensation as required by sections 13 and 242 of the Constitution of Kentucky. Moore v. Lawrence County, 143 Ky. 448, 136 S. W. 1031; Bedford-Nugent Co. v. Herndon, 196 Ky. 477, 244 S. W. 908; Letcher County v. Hogg, 209 Ky. 182, 272 S. W. 423; Webster County v. Lutz, 234 Ky. 618, 28 S. W. (2d) 966; United States v. Welch, 217 U. S. 333, 30 S. Ct. 527, 54 L. Ed. 787, 28 L. R. A. (N. S.) 385, 19 Ann. Cas. 680; United States v. Lynah, 188 U. S. 445, 23 S. Ct. 349, 47 L. Ed. 539; 10 R. C. L. 66, 70, 81; 27 R. C. L. 1100; 20 C. J. 684.

Particularly pertinent is City of Ennis v. Gilder, 32 Tex. Civ. App. 351, 74 S. W. 585, where a city in connection with its waterworks system built a dam across a stream and backed slack water over the plaintiffs' land. The court regarded the dam as a nuisance, and held the plaintiff had the right to have it abated so far as he was affected by it, but that he could have treated it as a permanent injury to his land and proceeded to recover in damages the difference between the value of his property before and after the injury.

By legislative authority granted the Bowling Green Water Works Company in 1868, the city was and is empowered to take water from this river (Acts of 1868, p. 9), and has the p o w e r of eminent domain to secure a proper water supply. Dillon on Municipal Corporations, sec. 1033; McQuillin on Municipal Corporations, sec. 1615. But the point is insisted upon that the building of the dam was unnecessary, and that private property can be taken as under the right of eminent domain only for necessary public use. The pro-

594

position of law is undoubtedly sound (Riley v. Louisville, H. & St. L. R. Co., 142 Ky. 67, 133 S. W. 971, 35 L. R. A. [N. S.] 636, Ann. Cas. 1912 D, 23), but we cannot accede to the proposition of fact. The evidence shows that the erection of the dam was and is necessary not only because of the deepening of the pool, but as facilitating the pumping. It must therefore be deemed as a practical necessity and, being an accomplished fact, the plaintiffs are entitled only to a recovery of adequate damages for the taking of their property.

The judgment dismissing the petition rests upon the opinion of the trial court that plaintiffs' property was subject to the public right of navigation and the public's proper use of the river. Since we are of opinion that the loss suffered by the plaintiffs was not due to a taking for the improvement of navigation, it follows that the judgment must be reversed. We are of the further opinion that this is not a case for injunctive relief. The case is remanded for the purpose of having the amount of damages ascertained and adjudged.

Judgment reversed.

Whole court sitting.