171 So.2d 25 (1965)
C.C. MOORE and wife, Beatrice N. Moore, Appellants,
v.
STATE ROAD DEPARTMENT of the State of Florida, Appellee.
No. F-388.
District Court of Appeal of Florida. First District.
January 19, 1965.
*26 Isler & Welch, Panama City, for appellants.
P.A. Pacyna, Tallahassee, for appellee.
STURGIS, Chief Judge.
Appellants, plaintiffs below, seek reversal of the following final decree entered by the Honorable Hugh M. Taylor, Circuit Judge:
"FINAL DECREE
"This action was instituted by a complaint seeking an injunction restraining the State Road Department from constructing a bridge hereinafter referred to as the new DuPont Bridge on the theory that this bridge would constitute an impairment of the riparian rights of the plaintiffs.
"A temporary injunction was denied, and the Court on October 22, 1963, entered an order holding that if the plaintiffs were entitled to relief the relief to be awarded should be a mandatory injunction requiring the defendant to acquire the needed portion of the plaintiffs' riparian rights by exercise of the power of eminent domain rather than an injunction restraining the construction of a bridge which is a vital part of an essential highway.
"On final hearing the Court has heard the testimony and makes the following findings of fact:
"United States Highway 98 crosses the inland waterway at a point in Bay County a short distance southeasterly of Panama City, and at a point between Panama City and Tyndale Air Force Base. As a part of this highway, there is presently a bridge called the DuPont Bridge crossing the inland waterway at a point near the confluence of the waters of St. Andrews Bay with the waters of East Bay.[1] This bridge runs in a northeasterly direction from a small peninsula on the south side of St. Andrews Bay to a peninsula known as Long Point on the north side of St. Andrews Bay. The proposed new DuPont Bridge runs across the inland waterway from the same point on the south side of St. Andrews Bay to a spot on Long Point several hundred feet west of the northerly end of the old DuPont Bridge. Plaintiffs own a parcel of land on the tip of Long Point lying partly on each side of the abutments of the northerly end of the old bridge and the Highway approaching that bridge from the north. Their lands extend westerly some distance from the old bridge but do not touch the right-of-way of the new bridge or the highway running northerly from the new bridge to the point where traffic will be returned to the old roadbed of highway 98.
"The theory of the plaintiffs' case is that the construction of the new bridge will impair substantially the riparian rights incident to the plaintiffs' ownership of the land lying between the old bridge and the new bridge.
"The old bridge contains a swing section to permit the passage of traffic on the inland waterway. The new bridge will contain no movable span but will have a vertical clearance for all traffic moving along the inland waterway as such but will not permit the passage of deep sea cargo or passenger ships which use St. Andrews Bay in substantial numbers.[2]

*27 "The entrance channel to St. Andrews Bay has a depth of 30 ½ feet. The waters of this bay are for the most part west of both bridges, however, the waters extending east from the location of the bridges have a minimum depth of 32 feet for a distance of more than a mile east of the bridges so that, but for the interference of the bridges, it would be possible for any ship entering St. Andrews Bay to travel along this channel for that distance eastward from either bridge.
"If the demand for dockage was sufficiently great, it would be practical to construct docks capable of berthing deep sea vessels along both the south and the north shores of the inland waterway for some distance easterly from the bridges, but the cost of constructing such docks would be substantially greater than the cost of constructing a dock of this type on the land of the plaintiffs lying between the two bridges. This is due to the fact that the deep waters of the channel extend much closer to the shore line opposite this property of the plaintiffs than at any other point in that vicinity. Lying immediately west of plaintiffs' property and lying on both sides of the northerly approach to the new DuPont Bridge is a tract of land upon which there is now located a dock for the unloading and tanks for the storage of petroleum products. These docks have been used by deep sea vessels. At no time in recent years has a deep sea vessel attempted to pass through the swing span of the old DuPont Bridge. The evidence does not disclose the width of the opening in this bridge.
"The Court finds that the construction of the new bridge will prevent the use of plaintiffs' property as a place for the operation of docks for the berthing or unloading of deep sea ships; that the construction of this bridge will also prevent the operation of docks for the berthing or unloading of deep sea ships for a substantial distance eastward on the north and on the south shores of the bay.
"There is substantial but constradicted evidence that the highest and best use to which plaintiffs' land is adapted is for development as industrial property designed to accommodate ships of a size that could not pass under the new bridge. The Court declined to hear additional witnesses on behalf of the defendant on this point being of the opinion that when it appears that there is substantial, competent evidence tending to show that a public structure is injurious to a citizen the only question which a chancellor may decide is whether or not the erection of such structure constitutes a taking of the property of the citizen. If the chancellor finds that there has been a taking of riparian rights of the plaintiffs, he must leave to a jury the question of the damages, if any, resulting from the taking.
"The plaintiffs' land lies in such relationship to the proposed bridge that the bridge will to a limited degree impair plaintiffs' view of the broad expanse of the Bay. The plaintiffs' land lying west of the old approach to the old DuPont Bridge is roughly triangular in shape with an approximate right angle located on the old highway, one of the other angles being at the waters edge where the right-of-way of the old road enters the Bay. The third corner is approximately 100 feet from the proposed right-of-way (180 feet wide) where the new highway enters the Bay. If a pier should be constructed from this corner of plaintiffs' land parallel to the land line, it would reach the bridge before it would reach the channel, but such construction would be over shallows immediately adjacent to the property of others and would very definitely interfere with the use of the land of others. Any pier *28 constructed from the plaintiffs' land in such manner that it did not run in front of the land of another between the shore line and the channel would reach the channel before it reached the bridge. The plaintiffs are thus not cut off by the bridge from a lawful right of access to the channel of the body of water adjacent to their land whether it be called St. Andrews Bay, East Bay or the inland waterway.
"The construction of the new bridge will not deny plaintiffs access to the channel of deep water immediately in front of their property. It will deny plaintiffs, along with all others owning property on the shores of the Bay for a distance of more than a mile, the right to put their property to a use to which the property is reasonably adapted. The resulting injury to the plaintiffs will be of the same kind but in greater degree than that suffered by others. The navigation rights of the general public are to some degree restricted.
"Much has been written on the delicate subject of riparian rights, and the problems of the courts in this area of the law become more complex as the use of riparian properties increases. The point at which the rights of the riparian landowner as such end and the public rights of navigation begin is not always easy to determine, but it is the controlling factor in cases of this kind. The public right of navigation at a particular point may be restricted by a bridge or dam having a greater public value without invading the property rights of any citizen although the result may be substantial business loss to persons previously exercising the public right to use the waterway. But riparian property rights may not be taken without compensation.
"Plaintiffs rely heavily upon the decision of the Supreme Court of Florida in the case of Webb v. Giddens [Fla.] 82 So.2d 743. The defendant counters by citing Carmazi v. Board of County Commissioners [Fla.App.], 108 So.2d 318. This Court originally decided the Webb case and has carefully considered the Carmazi decision and finds no conflict between the two. On the contrary, each case assists in determining the line of demarkation between private and public rights in the use of waters.
"In the Webb case a landowner abutting a small arm of Lake Jackson had been cut off from the remainder of the lake by a fill across this arm. This Court held that Giddens had been denied `access by boat from his land to the main body of the lake.' The Supreme Court held that this was the `key determination' of the case.
"In the Carmazi case the Court of Appeals held that the erection of a dam across Little River did not violate property rights of upper riparian owners even though there was a pre-existing dam farther up-stream so that the rights of navigation of landowners between the two dams were severely limited.
"The distinction between the two cases is that in the Webb case access to the main body of the waters was not preserved, and riparian rights were impaired, while in the Carmazi case access to the main body of the river was not impaired, and the only rights infringed were rights of navigation.
"In the case at bar, the access of the plaintiffs to the inland waterway and their access to the deep waters of the Bay are not taken. Their riparian property rights are, therefore, not impaired. The inability of seagoing vessels to navigate the channel to a point in front of plaintiffs' property resulting from the new bridge is an impairment of the public right of *29 navigation which plaintiffs will suffer along with others. Their loss, if any, will be damnum absque injuria.
"It is, therefore,
"CONSIDERED, ORDERED, ADJUDGED and DECREED that the plaintiffs are not entitled to the relief prayed for, and their complaint is hereby dismissed with prejudice."
The assignments of error challenge the decree on the ground that it is contrary to the law and manifest weight of the evidence. We have carefully reviewed the record and find that appellants have failed to demonstrate error. The discussion of the applicable law as stated in the decree is adopted in all respects.
Affirmed.
WIGGINTON and CARROLL, DONALD K., JJ., concur.
NOTES
[1] "The parties do not agree as to the exact boundary between these two Bays, but this is wholly immaterial to the issue presented, and, without making any ruling on that question, the Court will refer to the waters deep enough to carry deep sea ships as St. Andrews Bay.
[2] "During the calendar year, 1963, 167 ships of this type served the Port of Panama City, and an additional 15 ships of this class were towed into ship yards on St. Andrews Bay for dismantling.