COMMONWEALTH of Kentucky, DEPART-
MENT OF HIGHWAYS, Appellant,

v.

M. W. THOMAS et ux., Appellees.

Court of Appeals of Kentucky.

Dec. 15, 1967.

As Modified on Denial of Rehearing
May 10, 1968.

---

Robert Matthews, Atty. Gen., H. C.
Smith, Asst. Atty. Gen., Frankfort, Richard
Weisenberger, Dept. of Highways, Padu-
cah, for appellant.

Ben B. Wright, Hopkinsville, for ap-
pellees.

EDWARD P. HILL, Judge.

In this case the novel question is pre-
sented concerning the right of riparian
or littoral landowners to recover for the
destruction or impairment of their access to
Barkley Lake by reason of the construction
by appellant of a roadway, also by a fill
across an inlet bordering on the landowners'
property. The courts of the states are about
equally divided in interpreting the law on
this question.

The judgment appealed from awarded appellees $18,000 damages, from which only the Commonwealth appeals. The award of the county court commissioners was $7500.

Appellees own an 18-acre "lakeside development" tract of land on Barkley Lake. Appellant is taking 1.87 acres for a road right of way. An additional 0.725-acre section is severed from the main tract and is left between the new road and the lake.

The west side of appellees' land fronts the main body of Barkley Lake. The north side fronts on a shallow inlet or cove known as Terrapin Creek Bay. A high earthen fill was planned across said Bay (which by now no doubt has been completed) so that the portion of appellees' land fronting on Terrapin Creek Inlet will have no access by water to Barkley Lake. The culvert at Terrapin Creek is too small for the passage of boats. So the small portion of land taken (less than two acres) has not grieved appellees nearly as much as the taking of their access from their lots adjoining Terrapin Creek Bay to the main body of the lake.

Appellants contend on this appeal that inasmuch as the land on which the fill across Terrapin Creek was constructed was not the land of appellees, they are in no position to complain; that appellees are not entitled to compensation for loss of access to Barkley Lake; and that the verdict is excessive.

■ On the first argument advanced by appellant, it may be said as a general proposition in highway condemnation cases that "recovery for diminution of value suffered by virtue of construction and operation of adjacent public works is usually not allowed when no part of the property is deemed to have been taken." Orgel on Valuation under Eminent Domain, vol. 1, 2d, § 54, p. 254. Appellant cites a number of cases involving the taking of land for highway purposes, which particularly refer to questions of rerouting of highways, loss of profits, inconvenience, rerouting of traffic, and loss of access. But these cases are of little assistance in determining the riparian rights of appellees herein.

We turn now to the question of the riparian or littoral rights, if any, of appellees. In doing so, our research leads us immediately to a jungle of confusion and inconsistencies. As proof of this statement, it is written in 93 C.J.S. Waters § 6, p. 606, that:

"The common-law rules as to riparian rights exist in a number of jurisdictions, but have been modified in some, while in others riparian rights have been abolished or do not exist."

In Nichols on Eminent Domain, 3d, vol. 2, Riparian Rights, § 5.79, p. 223, it is said: "There is very little uniformity in the decisions as to what constitutes a compensable interference with or destruction of the rights of a riparian proprietor."

Riparian rights in the various states of this Union have been further confused by public rights and regulations. 65 C.J.S. Navigable Waters § 61.

We now take a look at some of the decisions denying recovery to riparian proprietors. First in this category is United States v. Rands et ux., 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329, decided November 13, 1967. Rands owned land on the Columbia River in the state of Oregon. It was taken by the United States in connection with the John Day Lock and Dam Project as a part of the comprehensive plain for the development of the Columbia River. The Supreme Court denied a recovery for the value of Rands' port site. His recovery was limited to the diminution in the value of his fast lands, disregarding the value of his port site. The U. S. Supreme Court said:

"But 'just as the navigational privilege permits the Government to reduce the value of riparian lands by denying the riparian owner access to the stream without compensation for his loss, it also permits the Government to disregard the value arising from this same fact of

riparian location in compensating the owner when fast lands are appropriated.' United States v. Virginia Elec. & Power Co., 365 U.S. 624, 629, 81 S.Ct. 784, 788, 5 L.Ed.2d 838 (1961)."

As recently as October 3, 1967, in Colberg, Inc. v. State ex rel. Department of Public Works, 62 Cal.Rptr. 401, 432 P.2d 3, California denied recovery to the riparian proprietors, Colberg and Stephens. For sixty years they had owned and conducted shipyards for the construction and repair of yachts and ocean-going vessels on the Stockton Deep Water Ship Channel, a navigable tidal waterway extending from the mouth of the San Joaquin River to the Port of Stockton.

It should be noted in this connection that while California has a constitution similar to our own, requiring "just compensation" for land taken for public use, yet the "State of California holds all of its navigable waterways and lands lying beneath them 'as trustee of a public trust for the benefit of the people.'" The interference by the state, giving rise to the litigation, consisted of the construction of a bridge arching 45 feet above the water line so that most ocean-going vessels could not get to plaintiffs' shipyards.

In denying recovery, the California court said in Colberg, supra, 432 P.2d at page 11:

"As we have shown above, the power of the State of California to deal with its navigable waters, though subject to the superior federal power, is considerably wider in scope than that paramount power. The state, as owner of its navigable waterways subject to a trust for the benefit of the people, may act relative to those waterways in any manner consistent with the improvement of commercial traffic and intercourse. We are of the further view that the law of California burdens property riparian or littoral to navigable waters with a servitude commensurate with the power of the state over such navigable waters, and

that 'when the act [of the state] is done, if it does not embrace the actual taking of property, but results merely in some injurious effect upon the property, the property owner must, for the sake of the general welfare, yield uncompensated obedience.' (Gray v. Reclamation District No. 1500, supra, 174 Cal. 622, 636, 163 P. 1024, 1030)."

Taking its place along with the Supreme Court of the United States and the state of California, our own sister state of Ohio held in State ex rel. Anderson v. Masheter, 1 Ohio St.2d 11, 203 N.E.2d 325 (1964), that a riparian proprietor operating a marine terminal on the Maumee River could not recover damages to his business occasioned by the construction of a low-level bridge several thousand feet downriver from his property. The court said on page 328 of 203 N.E.2d:

"Where the construction of a bridge across a navigable stream is properly authorized, riparian owners who have access to the navigable part of the stream but who are cut off from navigation to and from the outside world have no constitutional right to compensation."

To the short majority opinion in Masheter, supra, Judge Herbert wrote an exhaustive dissent, in which he took the position that Masheter was not founded upon Ohio case law precedent.

Other states, including the so-called arid midwestern states, have followed the line of authorities denying recovery to riparian proprietors in cases similar to the one at bar.

States that have taken the opposite view and allowed recovery for impairment of riparian rights include: Florida, Tennessee, Virginia, Ohio, Michigan, Oregon, Washington, our own state of Kentucky, and many others. See 65 C.J.S. Navigable Waters § 67, note 33.

■ All the authorities agree that riparian rights in navigable waters are held in subordination to the right of the public to

navigate such waters and to make improvements in aid of such navigation. Before the construction of Barkley Dam and the resulting formation of Barkley Lake, the Cumberland River in the vicinity of the property here involved was a navigable stream. Consequently, Barkley Lake is a navigable body of water, including all of its bays and inlets. But the fill in question in the present case is in no way or manner an "aid or improvement" of navigation.

We turn now to consider some of the authorities which recognize access rights of riparian owners. In 18 Am.Jur., Eminent Domain, § 166, pp. 798, 799, it is stated:

"The cases are almost unanimous in holding that, except when the rights of the government are involved, the riparian right of access to the navigable part of the river is property which cannot be taken or damaged for the public use without compensation, and that the destruction of access by the construction of a railroad, highway, or other public work in the submerged bed of the river between the channel and the upland is a taking of property in the constitutional sense, even though the bed belongs to the state and the work be done by legislative authority."

We find a factual situation practically identical to the case at bar in Webb v. Giddens, Fla., 82 So.2d 743 (1955). The plaintiff in Webb owned a boat dock on a small arm of a navigable landlocked lake. The state road department constructed a fill and culvert across the arm of the lake, thereby preventing boats from going to the main body of the lake from plaintiff's boat dock. In the following language the Florida Supreme Court held that the fill constituted an impairment of plaintiff's riparian right of access to the lake proper:

"Obviously, he (plaintiff) has a right of ingress and egress from his lands into the water immediately adjacent thereto. But the record shows, in accordance with the findings in this case, that this right

would be virtually meaningless unless he were allowed access to the main body of the lake."

The rule in Webb, supra, was reaffirmed in Moore v. State Road Department, Fla., 171 So.2d 25 (1965).

While this court has never been presented with the exact delicate question involved in the present case, it did decide in Natcher v. City of Bowling Green, 264 Ky. 584, 95 S.W.2d 255, 260, that Natcher, a riparian owner of land upstream from the city of Bowling Green, could recover from the City as a result of the construction of a dam by the City that raised the water level over the gravel bar of Natcher. In Natcher this court said:

"We are therefore constrained to hold that the erection of the dam was not under the dominant proprietary power of the city in the stream 'to improve or preserve navigation,' which had been conferred upon it by the state.

\*   \*   \*   \*   \*   \*

"The flooding and submersion of appellant's gravel beds was a direct encroachment upon their land, and restricted, if it did not actually exclude, their dominion or control over it. This constituted a taking of private property by the city, and it must make compensation as required by sections 13 and 242 of the Constitution of Kentucky."

Let us keep in mind that the riparian rights of the land owned by appellees were created by the U. S. Government in the construction of Barkley Lake and the impounding of the water of the Cumberland River above the dam. It is simple logic that as soon as it became generally known that Barkley Dam was to be constructed and the high-water mark determined, appellee's property, like thousands of other acres of land adjoining artificial lakes in the Commonwealth, enjoyed a fantastic increase in value. The value is there; it is recognized by the buyer, the seller, and everyone else.

It occurs to this court that the question in this case has weighty public policy considerations. This Commonwealth has more miles of navigable rivers than any other inland state in the Union (including the tortuous Cumberland, which raises its head in John Fox, Jr., country, the mountains of southeastern Kentucky, snakes its way south into the state of Tennessee before becoming homesick for its native land and streaking north to entirely embrace its mother state before spending itself in the beautiful Ohio). The construction of numerous multipurpose dams has provided the fair state of Kentucky with more miles of lake shore line than any other state, with the possible exception of Minnesota. (Approximately 6,000 miles of shore line, containing 180,000 acres of surface water, and more dams are being built.) Industry is moving into our State at an accelerated rate. The population is increasing. Leisure time is also increasing with automation, resulting in greater demand for recreation. All of this tends to increase the value of land with access to our lakes. This court will not blindly disregard such obvious facts existing in this Commonwealth in regard to value of land suitable for camp sites fronting on public lakes with recreational facilities, and practically all of them enjoy such facilities.

We have concluded that riparian landowners have the right of a reasonable access to the entire body of water on which their land borders; that such right has value; and that before the State may take or impair such right, it must pay the owner just compensation therefor.

The recent Supreme Court decision in United States v. Rands, supra, states:

"And, in River Rouge, it was recognized that state law may give the riparian owner valuable rights of access to navigable waters good against other riparian owners or against the State itself."

Cf. United States v. River Rouge Improvement Co., 269 U.S. 411, 418, 419, 46 S.Ct. 144, 70 L.Ed. 339 (1926).

Having reached this conclusion, there remains the question of whether or not the amount of the verdict is excessive.

Appellees' maps indicate their property has been laid off into a subdivision containing 57 lots, 13 of which front on Terrapin Creek Bay. Appellees' seven witnesses were duly qualified according to accepted rules and they were experienced. Their differences in the before and after value ranged from $21,000 to $28,000. We cannot escape the feeling that the amount of the verdict is most liberal. Neither can we conclude at first blush that bias, passion, or prejudice influenced it.

On Petition for Rehearing

Since the foregoing opinion was rendered, the Commonwealth has petitioned the court for a rehearing. It now contends "that appellees were never riparian owners for two reasons: (1) the road was completed and no water had even reached the road at the time of the trial; and (2) this road project is a part of the overall Barkley Dam project which took into consideration that the existing road would be covered with water in places, and provision was made to raise the road out of the water. The official designation of this project is BD 24 (Barkley Dam 24), which is being constructed by the state and is being paid for totally out of Barkley Dam funds." These arguments are raised for the first time in the petition for rehearing. Therefore, they will not be considered. RCA 1.350(b).

The testimony appearing in the transcript of evidence, page 4 through 7, does not make this clear. There is only a reference to a map which the witnesses said indicated the area "that will be impounded when the water is brought in."

With respect to the second contention the "road project is part of the overall Barkley Dam project," we are not favored with a reference to the testimony that so indicates (RCA 1.210(a) 3 (b), and we have not observed any such testimony in

the evidence. The condemnation petition indicates that it is a typical road condemnation proceeding by the Commonwealth.

The third contention is that the special damage claimed was not pleaded, a requirement of CR 9.06. This issue also is raised for the first time in the petition for rehearing; therefore, we will not consider it. RCA 1.350(b).

Our opinion is not to be interpreted as an adjudication of the law if the contentions asserted in the petition for rehearing had been timely raised.

The judgment is affirmed and the petition for rehearing is overruled.

WILLIAMS, C. J., and MILLIKEN, OSBORNE, PALMORE and STEINFELD, JJ., concur.

MONTGOMERY, J., dissents.