Leslie **WERNBERG**, Appellant,

v.

**STATE** of Alaska and **City of Anchorage,** Appellees.

No. 1797.

Supreme Court of Alaska.

Dec. 10, 1973.

Rehearing Denied Feb. 27, 1974.

James K. Tallman, Anchorage, for appellant.

John E. Havelock, Atty. Gen., Juneau, Malcolm L. McCain, Asst. Atty. Gen., John R. Spencer, City Atty., William G. Azar, Asst. City Atty., Anchorage, for appellees.

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

ERWIN, Justice.

Leslie Wernberg, appellant, for 29 years has been the owner of property which abuts Chester Creek and Cook Inlet tide flats. Chester Creek flows past the property on the north and empties into the inlet which is on the west of the appellant's property. For 20 years Wernberg used both the creek and the tidewaters to navigate his fishing boats between his property and Cook Inlet for commercial fishing. Between high and half tide he navigated the stream and the tidal flow to get to deep water. The navigation included the transportation of supplies, fish, fishing gear, boats, and other transportation activities connected with the appellant's fishing operations in Cook Inlet.

· During 1967 and 1968 the State of Alaska constructed the Minnesota By-pass, a federal aid highway, across Chester Creek and the tidelands of Cook Inlet about one-half mile west of appellant's property. The highway obstructed the flow of high tide waters up the creek, thereby destroying its navigability. The road also blocked appellant's access from his property across the abutting tidelands to the deep water of Cook Inlet.

Wernberg's non-water access to his land is by way of Spenard Road which abuts the eastern boundary of his property. Prior to 1968, the landowner used Spenard Road as access for trucks to his land.

Spenard Road is owned by the State of Alaska, having been deeded to the state by the federal government in 1959, upon Alaska's admission to the union. For at least the last six years, the City of Anchorage has maintained Spenard Road pursuant to an agreement with the state.

As part of the Minnesota By-pass project the city, in conjunction with the state, changed the portion of Spenard Road abutting Wernberg's property from a two-way to a one-way thoroughfare in 1968. Appellant contends that the change of the traffic pattern on Spenard Road impaired truck access to his property, since the angle of his driveway makes it difficult for the operator of a long-wheelbase truck to make the sharp left turn from Spenard Road into his driveway.

Appellant further alleges, and appellees admit, a four inch change in the grade of Spenard Road, which was caused by the 1964 earthquake, accumulation of gravel on the sides of the road, and re-surfacing of the road by the city pursuant to its maintenance contract with the state. Three-eighths of an inch change in grade was due to the re-surfacing, and the balance was due to the other two factors.

Wernberg brought suit against the State of Alaska and the City of Anchorage in inverse condemnation in the superior court. He alleged an uncompensated taking and/or damage to his property occasioned by the obstruction of his access from Chester Creek to Cook Inlet and by the impairment of his access to Spenard Road.

At the pre-trial conference the court dismissed the complaint, with leave to amend, for failure to state a valid claim for relief. The court made it clear, however, that it considered its judgment final for the purposes of appeal. Wernberg filed notice of appeal, but also amended his complaint, alleging, in addition to the previous counts, loss of access from his land to Cook Inlet across the tidelands, loss of his rights of appropriation in Chester Creek, and impairment of access to Spenard Road caused by the grade change. The amended complaint was also dismissed for failure to state a claim upon which relief could be granted and for lack of an issue as to a material fact. The order dismissing the complaint was accompanied by an order awarding attorney's fees to the City of Anchorage. Appellant amended his notice of appeal from the dismissal of the original complaint to include appeal from dismissal of the amended complaint and the order assessing attorney's fees.

I

 To facilitate understanding of some of the issues presented, it is appropriate to briefly review some of the doctrine of riparian rights.[1] Simply stated, the rule is that an owner of land abutting a body of water (the riparian proprietor) has an individual right to use the water.[2] The precise origin of the doctrine is unknown, but it appeared in early Roman law, was later recognized as part of French law by the Code Napoleon, and emerged in the common law of England and the United States.[3] In the United States the doctrine, initially shaped by the writings of James Kent and the opinions of Justice Story,[4] developed different forms in the various states. In the arid western states the rights of riparian proprietors were made subject to those of non-riparian landowners who were prior appropriators of the waters,[5] and in the eastern portion of the country there has been a slow movement away from the doctrine of riparian rights.[6]

 The particular rights delineated by the doctrine are, naturally, many and varied. Generally speaking, a riparian proprietor has the right to: (1) use the water for general purposes such as bathing and other domestic activities; (2) have access to navigable waters; (3) build wharves and piers out to deep water if this can be done without interfering with navigation; (4) take title to accretions and alluviums; and (5) make other beneficial use of the water even though the water level is lowered, so long as the use does not unreasonably interfere with similar rights of other riparians.[7] These rights are valuable property, and ordinarily cannot be taken for public use by the federal

1. The distinction should be noted between "riparian" and "littoral". According to Black's Law Dictionary (Rev. 4th ed. 1968), "riparian" means "belonging or relating to the bank of a river" (p. 1490), while "littoral" means "belonging to the shore, as of seas and great lakes" (p. 1083). The terms are often used interchangeably since there is a general congruence of rules relating to both.

2. Teclaff, What You Have Always Wanted to Know About Riparian Rights, But Were Afraid to Ask, 12 Nat.Res.J. 30 (1972).

3. *Id.* at 34, 39, 53.

4. 3 J.Kent, Commentaries on American Law 682–690 (14th ed. 1896) ; Tyler v. Wilkinson, 24 F.Cas. 472 (C.C.D.R.I.1827) ; Webb v. Portland Mfg. Co., 29 F.Cas. 506 (C.C.D.Me. 1838)

5. *E. g.*, Hutchinson v. Watson Slough Ditch Co., 16 Idaho 484, 101 P. 1059, 1061–1063 (1909).

6. Teclaff, *supra* note 2, at 40.

7. Harnsberger, Eminent Domain and Water Law, 48 Neb.L.Rev. 325, 381–382 (1969).

or state governments without payment of just compensation to the landowner.[8]

 It has long been recognized, however, that the rights of riparian owners are not absolute, especially when they conflict with the powers reserved to the federal and state governments. Under the Commerce Clause of the United States Constitution[9] the federal government has the power to regulate all navigable waters in the United States.[10] This power has given rise to a particular limitation or riparian rights known as the federal "navigation servitude" under which riparian rights are:

> . . . held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation.[11]

The federal navigation servitude has created an exception to the fifth amendment's prohibition, allowing riparian rights to be taken without compensation if the taking is in aid of navigation.[12]

 The states have derived a similar navigation servitude from their police power.

> We think it is a settled principle, growing out of the nature of well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated, that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property in this commonwealth, as well as that in the interior and that bordering on tide

waters, is derived directly or indirectly from the government, and held subject to those general regulations, which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment, as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient.

> This is very different from the right of eminent domain, the right of a government to take and appropriate private property to public use, whenever the public exigency requires it; which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the police power, the power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same.

> It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise.

> · · · · · · ·

> The facts and circumstances of different cases are so various, that it is often difficult to decide whether a particular exercise of legislation is properly attributable to the one or the other of these two acknowledged powers.[13]

8. 56 Am.Jur. Waters § 274, at 728–729 (1947).

9. U.S.Const. art. I, § 8.

10. Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824).

11. Scranton v. Wheeler, 179 U.S. 141, 162–163, 21 S.Ct. 48, 45 L.Ed. 126, 137 (1900).

12. U.S.Const. amend. V states in part:
No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

13. Commonwealth v. Alger, 61 Mass. (7 Cush.) 53, 84–86 (1851).

This state servitude is subordinate to the federal one,[14] but where the federal government has not acted, it allows the state, in aid of navigation, to take private riparian rights without paying the compensation that would otherwise be required by the fourteenth amendment.[15]

One commentator has derived three basic propositions from the state servitude:

(1) a taking in the aid of navigation of riparian property, including a right of access below the high water mark, is a valid exercise of the servitude and no compensation is required; (2) that a taking, even though in the aid of navigation, which encroaches upon the fast lands is a taking of private property in the constitutional sense and compensation is required; (3) that a taking of a riparian landowner's property below the high water mark, when not in the aid of navigation requires just compensation. (footnote omitted)[16]

These propositions have been expanded in many jurisdictions, and the same commentator describes three general varieties of the state navigation servitude doctrine: (1) the general rule; (2) the public purpose rule; and (3) the Louisiana exception.[17] The general rule requires the state to compensate the riparian owner for infringement of his property rights unless the project causing the harm is in aid of navigation.[18] The public purpose rule, on the other hand, requires no compensation if the offending project is for any public purpose.[19] Under the Louisiana exception, the scope of the servitude extends to projects "in aid of navigation" that are miles from the actual boundaries of the watercourse, allowing the state to burden all property in between without payment of compensation.[20]

In the case at bar, appellant urges this court to adopt the general rule, while the state presses for the public purpose rule.[21] The public purpose rule is best exemplified by Colberg, Inc. v. State.[22] In that case the state built two highway bridges across the mouth of a harbor, thus cutting off most marine access to and from a shipyard in the harbor. The California court held that it was not necessary to compensate the shipyard owner for loss of any riparian rights, on the theory that "California bur-

14. Gibson v. United States, 166 U.S. 269, 271–272, 17 S.Ct. 578, 41 L.Ed. 1000 (1897).

15. Natcher v. City of Bowling Green, 264 Ky. 584, 95 S.W.2d 255, 257 (1936); Home for Aged Women v. Commonwealth, 202 Mass. 422, 89 N.E. 124, 125 (1909).

16. Comment, The State Navigation Servitude, 4 Land & Water L.Rev. 521, 522–523 (1969).

17. Id. at 523.

18. Peck v. Alfred Olsen Constr. Co., 216 Iowa 519, 245 N.W. 131, 133 (1932); Natcher v. City of Bowling Green, 264 Ky. 584, 95 S.W.2d 255, 259–260 (1936); Michaelson v. Silver Beach Improvement Ass'n, Inc., 342 Mass. 251, 173 N.E.2d 273, 277 (1961); State ex rel. Andersons v. Masheter, 1 Ohio St.2d 11, 203 N.E.2d 325, 327 (1964); Oliver v. City of Richmond, 165 Va. 538, 178 S.E. 48, 49–52 (1935); Conger v. Pierce County, 116 Wash. 27, 198 P. 377, 378 (1921); Green Bay & M. Canal Co. v. Kaukauna Water-Power Co., 90 Wis. 370, 61 N.W. 1121, 1124 (1895); Crance v. State, 205 Misc. 590, 128 N.Y.S.2d 479, 481 (Ct.Cl.1954).

19. Colberg, Inc. v. State, 67 Cal.2d 408, 62 Cal.Rptr. 401, 432 P.2d 3 (1967), cert. denied, 390 U.S. 949, 88 S.Ct. 1037, 19 L.Ed.2d 1139 (1968); Lovejoy v. City of Norwalk, 112 Conn. 199, 152 A. 210, 214–216 (1930); Frost v. Washington County R. Co., 96 Me. 76, 51 A. 806, 809 (1901); Minneapolis Mill Co. v. Bd. of Water Comm'r's, 56 Minn. 485, 58 N.W. 33, 34 (1894); Crary v. State Highway Comm'n, 219 Miss. 284, 68 So.2d 468, 471–472 (1953); Darling v. City of Newport News, 123 Va. 14, 96 S.E. 307 (1918), aff'd, 249 U.S. 540, 39 S.Ct. 371, 63 L.Ed. 759 (1919). See also United States v. Virginia Elec. & Power Co., 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961).

20. 3 La.Stat.Ann.Civ.Code art. 665 (1952); Eldridge v. Trezevant, 160 U.S. 452, 40 L.Ed. 490 (1896). See 1 P. Nichols, Eminent Domain § 1.42 [1], at 1–122 (Rev. 3d ed. 1973).

21. The Louisiana exception is derived from the peculiar statutory structure of that state and is therefore not considered here.

22. 67 Cal.2d 408, 62 Cal.Rptr. 401, 432 P.2d 3 (1967), cert. denied, 390 U.S. 949, 88 S.Ct. 1037, 19 L.Ed.2d 1139 (1968).

dens property riparian or littoral to navigable waters with a servitude commensurate with the power of the state over such navigable waters," [23] and that in exercising that power "the state . . . may act relative to those waterways in any manner consistent with the improvement of commercial traffic and intercourse."[24] The *Colberg* court made it clear that California no longer limits its navigation servitude to projects in aid of water navigation:

> The limitation of the servitude to cases involving a strict navigational purpose stems from a time when the sole use of navigable waterways for purposes of commerce was that of surface water transport . . . . That time is no longer with us.[25]

The only limitation upon the navigation servitude recognized in the *Colberg* decision is that compensation must be paid where "the proper exercise of state power [in connection with navigable waterways] results in actual physical invasion of or encroachment upon fast lands."[26] Thus, compensation is not constitutionally required if the state's act "does not embrace the actual taking of property, but results merely in some injurious effect upon the property." [27]

*Colberg* has been extensively criticized.[28] The major objection seems to be that its doctrine would stifle private economic development of waterfront land.[29] Perhaps the greatest flaw in the *Colberg* reasoning is that it finds a state servitude broader in scope than the federal servitude to which it is admittedly subordinate.[30] · We find such a result difficult to justify in the case before us unless the Alaska Constitution specifically provides for an expanded definition of the navigation servitude which would permit the state to take riparian proprietors' property rights for "public purposes" without payment of just compensation.

The judge in the proceedings below relied on *Colberg* because of Alaska's peculiar statutory history.[31] While recognizing that the problem is one of public policy, he determined that under Alaska law the state, as owner of its navigable waterways, may act relative to those waterways in any manner consistent with the improvement of commercial traffic, both land and water. He further determined that the law of Alaska burdens all land riparian or littoral to navigable waters with a servitude commensurate with the power of the state over such waters, and, if the state's acts protected by that servitude do not embrace the actual taking of property but result merely in some injurious effect upon the property, the property owner need not be compensated.

23. *Id.* at 62 Cal.Rptr. 409, at 432 P.2d 11.

24. *Id.*

25. *Id.* at 410, at 432 P.2d 12.

26. *Id.* at 411, at 432 P.2d 13.

27. *Id.* at 409, at 432 P.2d 11.

28. Stoebuck, Condemnation of Riparian Rights, A Species of Taking Without Touching, 30 La.L.Rev. 394 (1970) ; Note, Colberg, Inc. v. State: Riparian Landowner's Right to Eminent Domain Relief for State Impairment of Access to Navigable Waterway, 72 Dick.L.Rev. 375 (1968), 21 Vand.L.Rev. 277 (1968) ; Corker, Federal-State Relations in Water Rights Adjudication and Administration, 17 Rocky Mt. Mineral L. Inst. 579, 601 (1972).

29. Commonwealth v. Thomas, 427 S.W.2d 213, 216–217 (Ky.1968).

30. Note, Colberg, Inc. v. State: Riparian Landowner's Right to Eminent Domain Re-

lief for State Impairment of Access to Navigable Waterway, 72 Dick.L.Rev. 375, 392 (1968).

31. The trial court traced the Alaska statutory provisions on eminent domain through the Montana Code to the "Field Code" of New York and thence to California (a Field Code state) :

> They are nevertheless persuasive since they give the Court the benefit of a full discussion of basically identical legal points in the interpretation of basically identical statutes. While I have reviewed decisions from Idaho, North and South Dakota and Montana, I have relied primarily upon California decisions because in addition to having similar statutes California like Alaska provides in its constitution that compensation must be paid for property damaged as well as property taken.

The state argues that the Alaska Constitution mandates the conclusion reached by the trial court. The basis of this argument is the language of article VIII, section 14, concerning access to navigable waters, and the comment on this language by the Resources Committee of the Constitutional Convention:

> *Access to Navigable Waters.* Free access to the navigable or public waters of the State, as defined by the legislature, shall not be denied any citizen of the United States or resident of the State, except that the legislature may by general law regulate and limit such access for other beneficial uses or public purposes.[32]
>
> (Sec. 15. *Access to Navigable Waters*) [Now Sec. 14]
>
> This section assures free access to the navigable waters of the state for "any person resident of Alaska or citizen of the United States." However, such access may be limited by other beneficial purposes such as the construction of a dam or other water works. Since the control of navigable waters is a federal question within the province of congressional authority, any actions taken by the federal government would supersede this constitutional provision.[33]

That the construction of the Minnesota By-pass was for "beneficial uses or public purposes" is self-evident.

■ We find the state's argument persuasive in that the Alaska Constitution does indeed allow the state to take riparian or littoral property rights for "beneficial or public uses" other than in aid of water navigation. To that limited extent we accept the reasoning expressed in *Colberg*.

The state further argues that the provisions of article VIII[34] operate to permit the taking of private property rights for public use without compensation as in *Colberg*. A careful reading of the constitutional minutes establishes that the provisions in article VIII were intended to permit the broadest possible access to and use

32. Alaska Const. art. VIII, § 14.

33. 6 Alaska Constitutional Convention Proceedings, at 87, 102 (1955).

34. Alaska Const. art. VIII states in part:
Section 1. *Statement of Policy.* It is the policy of the State to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest.
Section 2. *General Authority.* The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people.
Section 3. *Common Use.* Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.

. . . . .

Section 5. *Facilities and Improvements.* The legislature may provide for facilities, improvements, and services to assure greater utilization, development, reclamation, and settlement of lands, and to assure fuller utilization and development of the fisheries, wildlife and waters.

. . . . .

Section 13. *Water Rights.* All surface and subsurface waters reserved to the people for common use, except mineral and medicinal waters, are subject to appropriation. Priority of appropriation shall give prior right. Except for public water supply, an appropriation of water shall be limited to state purposes and subject to preferences among beneficial uses, concurrent or otherwise, as prescribed by law, and to the general reservation of fish and wildlife.
Section 14. *Access to Navigable Waters.* Free access to the navigable or public waters of the State, as defined by the legislature, shall not be denied any citizen of the United States or resident of the State, except that the legislature may by general law regulate and limit such access for other beneficial uses or public purposes.

. . . . .

Section 16. *Protection of Rights.* No person shall be involuntarily divested of his right to the use of waters, his interests in lands, or improvements affecting either, except for a superior beneficial use or public purpose and then only with just compensation and by operation of law.

. . . . .

Section 18. *Private Ways of Necessity.* Proceedings in eminent domain may be undertaken for private ways of necessity to permit essential access for extraction or utilization of resources. Just compensation shall be made for property taken or for resultant damages to other property rights.

of state waters by the general public.[35] However, there are uncertainties as to whether compensation was to be paid when private rights were taken, even in aid of a more beneficial public purpose. The constitutional minutes reflect the following discussion concerning a proposed amendment to the original language of article VIII, section 16:

> . . . The section that I'm proposing to amend immediately above that, though, speaks of "No person shall be involuntarily divested of his right to use of waters, his interest in lands, or improvements affecting either, except for a superior beneficial or public use and then *only by operation of law*." And it is most pointed that you haven't made any reference to eminent domain. Now, Mr. Riley told me that he thought "operation of law" embodied the thought of eminent domain and would probably be the type of proceedings used and that would carry just compensation. But, just to be sure, and for clarity's sake, I ask that, following the word "law" we say "with just compensation".[36]

In response to an objection to a request for unanimous consent, Delegate Riley made the following explanation, which led to the adoption of the amendment:

> Well, assume, Mr. Gray, that you have appropriated water for a specific purpose, and thereafter, another sought to use the same waters for a use or purpose considered to be of a superior or higher public purpose; although your appropriation would be better in time, he could institute condemnation proceedings and prevail over you by virtue of his higher public purpose to be served by that water, perhaps a public or municipal water supply.[37]

Under such conditions we are unable to accept the state's argument. We therefore hold that article VIII, section 16 of our constitution affords protection against the involuntary divestment of appellant Wernberg's property rights for a superior beneficial use (such as the construction of the Minnesota By-pass, here involved) by specifying that it shall be "only with just compensation and by operation of law".

Since we have concluded that compensation must be paid if a private property right is taken, we must next determine what property right, if any, is alleged to have been taken here. Wernberg claims that the state has taken his private "right of access" to the deep waters of Cook Inlet.

Some courts narrowly interpret the riparian "right of access" to deny compensation to an aggrieved proprietor. The theory commonly used by these courts is that the riparian or littoral proprietor has a private right of access extending only to the main stream of a channel. Once he gets to that point, his private right of access merges with, and becomes part of, the public right of navigation. Consequently, any state interference with the main stream itself is non-compensable infringement of public rights.[38] This distinction was explained by the New York Court of Claims in Marine Air Ways, Inc. v. State:[39]

> Distinguished from the right of access is the right of navigation, which is exclusively a public right. One is not to be confused with the other . . . . Where there is a lawful interference with navigation, a member of the public has no right to compensation therefor, and the owner of land abutting the water is not in a better position to claim compensation so long as his right of access is not denied him.[40]

35. *4 Alaska Constitutional Convention Proceedings*, at 2249–2568 (1955).

36. *Id.* at 2562.

37. *Id.* at 2563.

38. Note, *Colberg, Inc. v. State, supra* note 30, at 377–379.

39. 201 Misc. 349, 104 N.Y.S.2d 964 (Ct.Cl. 1951).

40. *Id.* at 967.

Like reasoning was employed by the Supreme Court of Ohio in State ex rel. Andersons v. Masheter.[41] The Andersons operated grain elevators and a marine terminal on riparian land. The state built a highway bridge across the river about a mile downstream from their property. The Andersons claimed that the bridge damaged their right of access because it was too low to allow passage of most ships to and from their property. The court, in denying compensation, said:

> Every riparian owner has the right of ingress and egress between his land and the water. In addition, as a member of the public, he has the right to travel on navigable streams. It is important to distinguish these rights. The right to go from his land to the river and from the river to his land is a private property right of the riparian owner. Navigation on public waters is exclusively a public right. Everyone has an equal right to the use of the water for travel and transportation.[42]

The courts which narrowly interpret the right of access are troubled by the "floodgates" argument. They express the fear that compensation for an obstruction downstream from property would necessitate compensation to all property upstream.

> It would seem that relator is claiming not merely a right of access to navigable waters, but a right of access to the outside world. If established as a principle

of eminent domain, a bridge in Louisiana would logically subject the state to claims by all owners on the Mississippi and its many tributaries.[43]

We note that the *Colberg* majority did not reach discussion of this point. It remained silent on the merits of a right of access claim.[44]

We must question the validity of a restricted definition of the private right of access in water cases, especially in view of the more realistic right of access recognized in land-access cases. A property owner on a public street has a private right of access to the intersecting public streets on either side of him.[45] We see little difference between land-access and water-access situations,[46] at least where the facts establish actual use of water access.[47]

We are concerned that the uncompensated taking of such a littoral access right may effectively render abutting land valueless or greatly reduce it in value.[48] Alaska has a seacoast longer than that of the entire United States. A large number of Alaskan communities are located on the shores of bays and inlets in order to gain water access for transportation and shipping, or easy access to the fertile fishing grounds of Alaska. A substantial amount of development in these cities is along the waterfront. Here the "floodgates" argument works in reverse, for a declaration that littoral access may be taken for any public purpose without compensation will

---

41. 1 Ohio St.2d 11, 203 N.E.2d 325 (1964).

42. *Id.* at 327.

43. State ex rel. Anderson v. Preston, 2 Ohio App.2d 244, 207 N.E.2d 664, 669 (Ohio App. 1963).

44. Colberg, Inc. v. State, 67 Cal.2d 408, 62 Cal.Rptr. 401, 432 P.2d 3, 8 (1967), cert. denied, 390 U.S. 949, 88 S.Ct. 1037, 19 L.Ed. 2d 1139 (1968).

45. 2A P. Nichols, Eminent Domain § 6.442, at 6–243, 6–244 (Rev. 3d ed. 1970); Note, California and the Right of Access: The Dilemma Over Compensation, 38 S.Cal.L.Rev. 689, 691 (1965); Annot., 73 A.L.R.2d 652 (1960).

46. In this we agree with the dissent of Justice Peters in *Colberg*. 62 Cal.Rptr. at 415,

432 P.2d at 17. *See also* Stoebuck, The Property Right of Access Versus the Power of Eminent Domain, 47 Tex.L.Rev. 733 (1969); Mayberry and Aloi, Compensation for Loss of Access in Eminent Domain in New York: A Re-evaluation of the No-Compensation Rule with a Proposal for Change, 16 Buffalo L. Rev. 603 (1967).

47. *Cf.* Note, Colberg, Inc. v. State, *supra* note 30, at 383–384; State ex rel. Andersons v. Masheter, 1 Ohio St.2d 11, 203 N.E.2d 325, 331 (1964) (dissenting opinion).

48. Commonwealth v. Thomas, 427 S.W.2d 213 (Ky.1968); State ex rel. Andersons v. Masheter, 1 Ohio St.2d 11, 203 N.E.2d 325, 331 (1964) (dissenting opinion). *See also* Gorman, Access Loss Distinguished From Traffic Flow Diversion, 3 Ariz.L.Rev. 48 (1961).

immediately devalue property in such areas and limit the development of many isolated communities whose only means of access is by water. The Kentucky Court of Appeals recognized this problem in *Commonwealth v. Thomas* [49] where the plaintiff owned land bordering on both a lake and an inlet of the lake. A portion of his land was condemned for a road which would bisect his land and continue across the inlet. From one portion of his land he still had direct access to the lake; from the other he had access only to the inlet, which the road cut off from the main body of the lake. The court awarded compensation for loss of access from the inlet to the lake. It concluded that:

> . . . riparian landowners have the right of a reasonable access to the entire body of water on which their land borders; that such a right has value; and that before the State may take or impair such right, it must pay the owner just compensation therefor. [50]

■ We emphasize that we are not here confronted with a theoretical littoral right which has not been exercised by the property owner. [51] In his amended complaint, Wernberg alleges that for more than 20 years he had used his littoral rights to gain access to the deep waters of Cook Inlet by means of both the tidal waters and Chester Creek. We hold that, as to the limited facts set forth with reference to deprivation of his use of such a private littoral right, he alleged a valid claim for compensation.

## II

■ The parties concede that a landowner has a private property right of access to an abutting public street. [52] The state admits that the right is compensable if taken, while the city would claim immunity under the "police powers" theory. Wernberg claims that the change of Spenard Road from a two-way to a one-way street, combined with the ⅜ inch change in the road grade attributable to re-surfacing by the city, substantially impaired his right of access to his property. While the contention that, by itself, a ⅜ inch change in grade is compensable is frivolous, [53] in certain unique factual situations it is possible that change in traffic flow from two-way to one-way, coupled with minor elevation changes, could constitute a constructive taking of access for which compensation should be paid. [54] The factors to be considered in determining whether there has been a constructive taking of access are (1) other methods of access; (2) topography of the land in question; (3) grade of the street; (4) topography of the land at the point where it abuts the street; and (5) the angle of access so far as ingress and egress are concerned.

■ In this case Wernberg claims that the change of traffic direction to one-way, the slight grade change, and the angle and elevation of the access road to his property result in a compensable taking because it is not possible to turn trucks from the street into his land, and he must go the wrong way on a one-way street to obtain access. We view such a description in the pleadings as equivalent to an allegation of constructive taking of access for which compensation must be paid. While this allegation is susceptible of factual proof, it clearly states a valid claim for relief.

Accordingly, this case is reversed, the judgment vacated, and the case remanded for further proceedings consistent with this opinion.

FITZGERALD, J., not participating.

49. 427 S.W.2d 213 (Ky.1968).

50. *Id.* at 217.

51. 4 R. Clark, Waters and Water Rights § 301.2(c), at 19 (1970).

52. See authorities cited *supra* in notes 45 and 46.

53. *Cf.* Williams v. State, 34 A.D.2d 101, 309 N.Y.S.2d 795, 798 (1970).

54. *See* Meloon Bronze Foundry, Inc. v. State, 10 A.D.2d 905, 200 N.Y.S.2d 563, 564 (1960); Holmes v. State, 204 Misc. 9, 123 N.Y.S.2d 161 (Ct.Cl.1952); 200 App.Div. 489, 111 N.Y.S.2d 634, 636–637 (1953); 282 App. Div. 278, 123 N.Y.S.2d 170 (1953); Mayberry and Aloi, *supra* note 46, at 620–622.